269 Cal.App.2d 526 (1969)
Estate of WILLIAM H. TALBOT, Deceased. WELLS FARGO BANK, as Trustee, etc., Petitioner and Respondent,
v.
SUSAN DARNEAL RICKER, Life Tenant and Appellant; CITY NATIONAL BANK et al., Remaindermen and Respondents.
Civ. No. 25032. 
California Court of Appeals. First Dist., Div. Three. 
Feb. 7, 1969.
 Faulkner, Sheehan & Wiseman, Faulkner, Sheehan, Wunsch & Hartman and Harold C. Faulkner for Life Tenant and Appellant.
 Slaughter, Schlesinger & McCullough, John S. McCullough, Rawles, Nelson, Golden, Poulos & Hinkle and John W. Poulos for Remaindermen and Respondents.
 Lillick, McHose, Wheat, Adams & Charles and Robert R. Vayssie for Petitioner and Respondent.
 SALSMAN, J.
 This is an appeal from an order of the superior court, instructing the Wells Fargo Bank, trustee of a trust established by William H. Talbot, deceased, that certain shares of General Motors stock, received by the trustee as part of a distribution of such stock by E. I. de Pont de Nemours, Inc. were to be taken into the principal of the trust and not to be treated as income available to the life tenant. The facts upon which the court based its order are not in dispute, but must be stated with sufficient particularity so that the foundation for the order, and the basis of our own decision affirming the order may be understood.
 William H. Talbot died in 1930. His will directed that certain shares of stock of the Talbot Commercial Company and the Puget Mill Company be distributed to his trustee to be held in trust for the benefit of his wife Susan Darneal Talbot (now Susan Darneal Ricker), during her lifetime and thereafter to be held in trust for the benefit of his children, and upon the death of his last surviving child to distribute the corpus of the trust to the issue of his children. Specifically the *530 will (and decree of distribution) gave the trustee power to "... invest and reinvest, hold or sell, convey or dispose of the same [the trust property] at public or private sale, at such time or times and on such terms as my trustee in its discretion shall deem advisable." Likewise, the will and decree directed the trustee to "... receive the dividends, rents, issues, income and profits thereof, and ... to pay over the net income therefrom to my wife, Susan Darneal Talbot, during her lifetime ..." and thereafter to pay the net income to his children until termination of the trust.
 Pursuant to its powers the trustee sold certain shares of stock distributed to it by the decree of distribution, and on December 20, 1943, purchased 110 shares of E. I. du Pont de Nemours, Inc. stock (hereafter referred to as du Pont). On August 28, 1946 the trustee sold 35 shares of du Pont and in April 1950 purchased 100 shares of the same stock. In 1949 de Pont split its stock 4 for 1. At the time the court entered its order from which this appeal is taken, the trustee held 400 shares of du Pont stock.
 On December 19, 1943, the day before the trustee made its first purchase of du Pont stock for the Talbot trust, du Pont owned 10,000,000 shares of General Motors stock. These shares were fully paid for and were carried by du Pont as an income-producing asset. It was du Pont's policy to pass on to its shareholders all income from its General Motors stock, "net of taxes." General Motors stock was twice split--in 1950 and in 1955--so that du Pont's original 10,000,000 shares became 60,000,000 shares. In 1955 du Pont, by the exercise of rights to purchase granted by General Motors, acquired an additional 1,000,000 shares of that stock, which by virtue of a stock split later the same year became 3,000,000 shares. Thus du Pont ultimately owned 63,000,000 shares of General Motors, which in 1960-1961 amounted to about 22 percent of the total stock of General Motors. This stock was carried on the books of du Pont at the considerable value of $1,266,300,000. This valuation was arrived at by du Pont in accordance with the equity value of the stock as indicated upon the consolidated balance sheet of General Motors. It is worthy of note also that du Pont's investment in the stock of General Motors represented approximately 27 percent of the total assets of the du Pont corporation.
 The record before us also reflects the well-known fact that the United States government, in anti-trust proceedings, compelled du Pont to distribute to its shareholders all of its General *531 Motors stock. (See United States v. du Pont & Co., 353 U.S. 586 [1 L.Ed.2d 1057, 77 S.Ct. 872]; United States v. du Pont & Co., 366 U.S. 316, 334 [6 L.Ed. 2d 318, 330, 81 S.Ct. 1243]; United States v. du Pont, Final Judgment Action No. 49C1071, United States District Court for the Northern District of Illinois, Eastern Division.)
 The board of directors of du Pont, acting under compulsion of the final judgment of the United States District Court, cited above, made three separate distributions of General Motors stock to du Pont shareholders. The resolution authorizing each distribution recited in part that du Pont had treated its block of General Motors stock as an investment and as a part of its income-producing assets, and had consistently passed on to its shareholders all of the dividends (net of taxes) received on such investment. In distributing this stock the directors also ordered that the distribution be charged against two accounts on the books of du Pont, the first being the "Paid-In Surplus" account, and the second being an account described as "Surplus Arising from Revaluation of Security Investments."
 The superior court found that du Pont's "Paid-In Surplus" did not result from or consist of any earned surplus or retained earnings, and that its "Surplus Arising from Revaluation of Security Investments" did not result from any earned surplus or retained earnings, and further that the shares of General Motors stock distributed to the trustee did not result from any earned surplus or retained earnings earned by du Pont after December 19, 1943 (the day before the trustee first purchased du Pont stock). In finding 35, the court also found that the 544 shares of General Motors stock distributed to the trustee was "... a return of du Pont capital to its shareholders, including the Trustee herein." Finding 36 recited that du Pont's distribution was in the nature of a partial liquidation of du Pont. Finding 37 declared that the distribution was not a dividend, and finding 39 stated that the distribution was "... not income within the meaning and intent of that term as used in the testator's ... Will ... and said Decree [of distribution] ...."
 [1a] The trustee of the Talbot trust received 544 shares of General Motors stock distributed to it by virtue of the ownership of du Pont shares. Whether the 544 shares of General Motors stock so received by the trustee are to be deemed income, and hence available to the life tenant, or are to be *532 deemed part of the corpus of the trust and held for the remainderman is the issue in this case.
 We observe first that the will of the testator does not aid us in the solution of the problem. As we have seen, the testator's will merely directs the trustee to "... receive the dividends, rents, issues, income and profits ..." of the trust property, and "... to pay over the net income ... to Susan Darneal Talbot, during her lifetime. ..." It is clear that the testator did not foresee the kind of distribution made here and therefore gave no direction to his trustee as to how a distribution of this nature should be treated. Of course, if the testator had expressed himself upon this subject and had made a clear and unequivocal statement governing this contingency, his intention, so expressed, would be controlling. (Estate of Traung, 30 Cal.2d 811, 816 [185 P.2d 801]; Estate of Jacks, 80 Cal.App.2d 562 [182 P.2d 605].)
 In 1953 our Legislature enacted a Principal and Income Law (Stats. 1953, ch. 37, 1, p. 666; Civ. Code, 730-730.15). One of the purposes of the statute is to establish rules by which income and principal may be ascertained and distinguished. (See Civ. Code, 730.05, 730.07.) Both appellant and respondent agree, however, that the statute has no application to the facts of this case, for the reason that the trust here involved was established in 1931, and the statute, by its express provisions, is made applicable only to trusts established after September 13, 1941. (Civ. Code, 730.02.) Accordingly, we must look for guidance to rules of law in effect in this jurisdiction prior to enactment of the statute, and in particular to rules in effect at the time of the creation of the Talbot trust.
 Where, as here, a testator has not expressed his intention as to whether particular receipts by his trustee are to be considered as principal or income, and statutory rules do not control, various rules by which to separate principal from income have been recognized. Each rule has been given the name of the jurisdiction in which it was first developed and applied. Thus there is the English rule, and the Massachusetts, Pennsylvania, Kentucky and Rhode Island rules, each a variant to some extent of the others. (See 33 Am.Jur. 445, Life Estates, Remainders and Reversions, p. 905, et seq.) We need not discuss the respective merits of each of these rules however, because the parties are in virtual agreement that this case is controlled by the Pennsylvania rule. Each party, however, as might be expected, reads the rule in his favor. *533
 [2] With respect to the rights of life tenants and remaindermen to the income or proceeds of trust property, the Pennsylvania rule disregards the character of the receipt as a cash dividend, a stock dividend, or an extraordinary dividend or distribution, and looks only to the period of time during which the dividend or other distribution was earned by the declaring corporation. If it is found that the dividend or other distribution represents earnings wholly earned before the commencement of the life interest, the rule awards the entire dividend, whether payable in stock or in cash, to the corpus of the trust. On the other hand, if it is found that the dividend or other distribution represents earnings wholly earned after the life interest attached, it is awarded entirely to income. Likewise, if the dividend or other distribution has been accumulated from earnings earned partly before the establishment of the life interest, and partly after, the rule calls for an apportionment of the dividend or other distribution between life tenant and remainderman, according to their respective interests. (Estate of Traung, supra, 30 Cal.2d 811, 814; see also 130 A.L.R. 492, Annot. Life Tenant and Remainderman--Dividends, p. 538; 33 Am.Jur. Life Estates etc., supra, p. 915.)
 California was committed to the Pennsylvania rule at the time of the creation of the Talbot trust, and it necessarily follows that the precepts of that rule must govern the resolution of the issues presented in this case. (Estate of Duffill, 180 Cal. 748, 758 [183 P. 337]; Estate of Traung, supra, 30 Cal.2d 811, 814.)
 [1b] Specific application of the Pennsylvania rule to the facts of this case requires affirmance of the order. As we have seen, that rule was in effect at the time the trust here in question was established. Our Supreme Court has twice declared, in the Duffill and Traung cases, supra, that this rule is applicable in this state. The trial court found on sufficient evidence that none of the earnings of the du Pont corporation earned after the trustee purchased its stock for the Talbot trust were used in the purchase of General Motors stock. It necessarily follows that the shares of General Motors distributed by du Pont must be awarded to the principal of the trust.
 [3] Appellant forcefully argues, however, that the award should go to the life tenant because, even under the Pennsylvania rule, if the "intact value" of the trust is not impaired by the distribution it must go to the life tenant rather than to *534 the remainderman. Appellant cites and relies upon Estate of Duffill, supra, 180 Cal. 748, 756.
 It has been said in a number of cases, including Duffill, supra, that where the giving of the stock dividend or other distribution does not impair the "intact value" of the corpus of the trust as it existed at the time of the death of the testator, or at the time the trust acquired its interest, the dividend or other distribution properly belongs to the life tenant. By "intact value" we understand the cases to mean the intrinsic value of the stock of the declaring corporation as shown upon the books of the company--in other words, the book value of the stock. If applied, this principle would mean that, if a trustee purchased stock of a given corporation in 1943, having a book value of $10 per share, and if the same corporation in 1968 declared a stock dividend or made a distribution of assets such as was made here, the dividend or other distribution would go to the life tenant if, after payment of the dividend, the stock of the declaring corporation retained a book value of at least $10 per share--in short if the "intact value" of the stock as of the date of the trustee's purchase were preserved.
 We cannot accept this contention. If we understand it properly it is arithmetically correct but economically in error. We may take judicial notice of the economic fact that the dollars are not the same. Moreover, Duffill's exposition of this contention did not form the basis of that decision. Duffill is in fact a precise application of the Pennsylvania rule we apply here, because in Duffill, earnings earned after the trustee acquired the stock were capitalized and a stock dividend issued thereon. As we have seen, in such cases the stock dividend, representing earnings of the corporation after the trustee acquired the stock, must be awarded to the life tenant in the absence of some other direction in the testator's will.
 Appellant argues that du Pont's distribution of General Motors stock is a dividend within the meaning of that term as used by the testator in his will and since it is a dividend it must all go to the life tenant. We do not find this argument persuasive. The provisions of the testator's will merely direct the trustee "... to receive the dividends, rents, issues, income and profits ..." and to "... pay over the net income therefrom ..." to his wife during her lifetime. There is nothing in this language to suggest that a large distribution of corporate assets such as occurred here should be considered as a dividend and hence income payable to the *535 life tenant. [4] The term "dividend" has various meanings. In its broad sense it refers to a sum or quantity to be divided. The term carries with it the idea "... of a fund owned by several parties, and the dividend is the aliquot portion of the estate of the common owners." (See People v. White, 85 Cal.App. 241, 254 [259 P. 76], citing 18 C.J. 1406.) But the common use of the word "dividend" especially among shareholders of private corporations organized for profit, is to designate the share of profits to be apportioned among stockholders as a return on their investment. (See Mestres v. California Mut. Bldg. & Loan Assn., 24 Cal.App.2d 434, 437 [75 P.2d 74]; 19 Am.Jur.2d, Corporations, 804, p. 281.) We do not know in what sense the testator used the term in his will or exactly what he intended, but it may reasonably be argued that he intended to preserve and protect the trust property in its entirety, permitting only the income to go to the life tenant. Language identical to that used by the testator here has been held to reflect an intention on the part of the testator to preserve the corpus of a trust. (Estate of Sloan, 222 Cal.App.2d 283 [35 Cal.Rptr. 167].) Merely to label du Pont's distribution of General Motors stock as a "dividend" payable to holders of du Pont stock does little if anything to settle the question whether under the guiding principles of the Pennsylvania rule as it existed in California when the Talbot trust was established, the distribution belongs to the trust as a part of the corpus or is payable to the life tenant as income.
 [1c] As we have seen, one of the trial court's findings was that du Pont's distribution of General Motors stock was a return of capital to du Pont shareholders. This finding is supported by the evidence. [5] There is a well recognized difference between the terms "capital" and "capital stock." The capital stock of a corporation represents the amount of money or property contributed by the shareholders to be used as the financial foundation from which the business of the corporation is to be carried on. The term "capital" on the other hand is often used broadly to indicate the entire assets of a corporation used for the purpose of deriving profit in the conduct of its business. (See 18 Am.Jur.2d, Corporations, pp. 735-736.) [6] Here, at the time the trustee made its first purchase of du Pont stock, the du Pont corporation possessed capital derived from its more than 11 million shares of common stock. There was evidence before the trial court that the du Pont corporation had owned its shares of *536 General Motors stock for more than 40 years; that the stock had been acquired in many transactions and that it was not possible for du Pont to trace the source of funds used in its purchase, because the general funds of the company had never been segregated as to those derived from capital funds, paid-in surplus or surplus earnings. But regardless of the source of funds used by du Pont to purchase the stock, it is clear from the record that all of it, with the exception of the 1,000,000 shares purchased in 1955 by an exercise of rights, was owned and fully paid for long before the trustee in this case purchased du Pont shares. There is no evidence in the record to show that the shares purchased in 1955 were purchased from earnings of the du Pont corporation earned after the trustee acquired its du Pont shares. We think it beyond dispute that at all times relevant to the issues in this case, the General Motors stock held by du Pont was part of the capital assets of the du Pont corporation.
 [7] Where a corporation owns specifically identifiable assets before a trustee acquires stock of the corporation, and such assets are later distributed as a dividend or other distribution, such assets are properly allotted to the corpus of the trust rather than to income. (Estate of Eilert, 131 Cal.App. 409 [21 P.2d 630].) This is true, even though the specific assets have enjoyed an increase in value between the time the trustee acquired the stock and the date of distribution. (Estate of Traung, supra, 30 Cal.2d 811, 815; see also Estate of Canfield, 104 Cal.App. 181 [285 P. 363]; Estate of Davis, 75 Cal.App.2d 528 [171 P.2d 463]; In re Bingham's Will, 194 N.Y.S.2d 465. This principle is recognized by the Restatement Second of Trusts, section 236(f), where it is said that a "... distribution by a corporation which is a return of capital and not a distribution of earnings is principal."
 [1d] There is a further ground upon which the order must be affirmed. The trial court found that the distribution of General Motors stock by du Pont was in the nature of a partial liquidation of the du Pont corporation and upon this ground, among others, awarded the distribution to the principal of the Talbot trust.
 [8] It is recognized that, upon the partial liquidation of a corporation, amounts paid upon distribution of the corporate assets are principal and not income. Thus, the Restatement Second of Trusts, section 236(e) declares: "Upon the total or partial liquidation of the corporation during the period, amounts paid as cash dividends declared before such liquidation *537 occurred or as arrears of preferred or guaranteed dividends are income; all other amounts paid upon corporate shares on distribution of the corporate assets to the shareholders are principal." (See also Rest. 2d Trusts, 236, com. on clause (e).)
 [9] Appellant argues, however, that there has been no partial liquidation of the du Pont corporation, and points to the fact that its capital stock remains the same, and in fact, is of much greater value after the distribution of the General Motors stock than it was at the time the trust acquired its interest. It seems inescapable to us, however, that a partial liquidation of the du Pont corporation did in fact occur. There was evidence that du Pont's investment in General Motors stock represented 27 percent of the total value of du Pont's assets. All of this value was stripped from du Pont by the federal court. To say that a corporation, divested of 27 percent of its total assets, is not partially liquidated is simply to deny the facts.
 [1e] We note also the involuntary nature of the distribution made in this case. [10] Ordinarily, whether a private corporation is to declare and pay a dividend, or make distribution of its assets is a matter committed to the sound business judgment of the corporation's board of directors. But the board of directors of du Pont exercised no independent judgment here. They acted only under the lash of the federal decree. There is substantial authority for the view that, where the corporate distribution is involuntary, the distribution is principal rather than income (See In re Estate of Anthony, 423 Pa. 401 [223 A.2d 857]; Fulweiler v. Spruance (Del.) 222 A.2d 555; In re Conway, 92 N.J.Super. 428 [224 A.2d 7].) The Restatement Second of Trusts, section 236 (e) reflects this view: "Where a corporation is directed by public authority to cease to hold shares of a subsidiary corporation, and it distributes such shares among its shareholders, such distribution may be held to be in the nature of a partial liquidation and allocable to principal." (See also 130 A.L.R. 586; 44 A.L.R. 1306; Scott on Trusts (3d Ed.) 236.5, p. 1991.)
 Although our principal and income statute is not controlling here, we note that it too declares that distributions made pursuant to court decree or final administrative order belong to principal rather than income. (Civ. Code, 730.06, subd. (b) (3).) *538
 Finally we observe that the judgment of the superior court accomplishes substantial justice between the life tenant and remainderman. [11] Between 1943, when the trustee first purchased du Pont stock, and 1962, when du Pont began distribution of its General Motors holdings, all of the dividends from General Motors stock, less taxes, were passed along to du Pont shareholders, including of course, the trustee of the Talbot trust. Appellant, as life tenant, has received all of the income allocable to shares held by the trustee. Now that the trustee holds the stock, the life tenant will continue to receive the income. There has been no change, except that dividends now flow from General Motors Corporation directly to the trust rather than to the trust through the du Pont corporation. Thus, the income of the life tenant continues as before, the corpus of the trust is maintained, the reminderman protected, and the scales of justice are in balance.
 The order is affirmed.
 Draper, P. J., and Brown (H. C.), J., concurred.