[Civ. No. 29688. First Dist., Div. Two. Nov. 27, 1972.]

GORDON PETER GETTY, as Trustee, etc., Plaintiff, Cross-defendant and Appellant, v.
J. PAUL GETTY et al., Defendants, Cross-complainants and Respondents;
LOUISE THEODORA LYNCH GASTON, as Administratrix, etc., Cross-defendant and Respondent.

## COUNSEL

James Martin MacInnis and William A. Newsom for Plaintiff, Cross-defendant and Appellant.

Brobeck, Phleger & Harrison, Moses Lasky, Hecht, Hadfield, Hays, Landsman & Head, and C. Lansing Hays, Jr., for Defendants, Cross-complainants and Respondents.

No appearance for Cross-defendant and Respondent.

## OPINION

**TAYLOR, P. J.**—This is an appeal by Gordon Peter Getty (Gordon), one of the beneficiaries of an *inter vivos* spendthrift trust created in 1934, from a judgment in favor of his father, J. Paul Getty, the sole trustee and major income beneficiary of the trust, and the other beneficiaries.[1] The case presents a question of first impression as to whether certain stock dividends[2] were properly allocated to the trust corpus; Gordon also asserts that the ratio of trust assets to which J. Paul Getty's waiver of income applies[3] was 36 percent of the stock in the corpus of the trust rather than the 20.70776 percent decreed by the court in the settlement of the trustee's accounts.

We shall set forth the facts relating to each question separately so that the judgment and our basis for affirming it may be more easily understood.

Gordon's first contention on appeal is that the stock dividends should have been allocated to income. He asserts that: 1) J. Paul was not a trustor; 2) J. Paul's waiver of the "entire net income" included the stock dividends; and 3) under the Pennsylvania rule in effect in this state at the time of the creation of the trust, stock dividends were to be treated as income.

The record, however, reveals the following pertinent facts supportive of the judgment: George F. Getty, the husband of Sarah and father of J. Paul,

---

[1] All of the other beneficiaries, remaindermen and possible remaindermen and all parties in being or yet to be born with an interest in the trust were duly joined in person or through their respective guardians ad litem.

[2] By stipulation of the parties, the allegations of the complaint were simplified to apply to the 2,469,359 shares of common stock received by the trustee between 1951-1957.

[3] This issue was raised by the cross-complaint that sought a settlement of the trustee's accounts from 1948-1966, and a declaration that all stock dividends were a part of the corpus.

died in 1930 after 50 years of building his oil business. He left his estate valued at $10,000,000-$15,000,000 to Sarah in the form of the controlling interest in the family corporation, George F. Getty, Incorporated. Thus, J. Paul was a minority shareholder and constrained in his efforts to expand the corporation by purchasing equities in other oil companies. As a result of his activities, the corporation was heavily in debt and Sarah unhappily viewed J. Paul's conduct as imprudent and reckless as her late husband had been frugal and conservative in the conduct of the business.[4]

In 1933, J. Paul persuaded Sarah to give up the worries of the business and sell him her stock in the corporation for his promissory notes. He then expected to have a free hand for his plans of expanding the business, but the notes affected the company's credit and further handicapped his plans for expansion. After Sarah refused to make a gift of the notes to him, she offered to put them in trust if he would also contribute to the corpus. J. Paul agreed to waive the income from his contribution to the trust to make the value of his contribution more than nominal. Sarah felt that the fiduciary responsibilities as a trustee would restrain J. Paul and cause him to act more conservatively in the operation of the business. Sarah wanted to preserve the business that her late husband had built up for the benefit of her great-grandchildren; J. Paul wanted the financial freedom to expand the business while retaining control of it.

Thus, the court found the pertinent facts substantially as follows: In 1934, Sarah desired to give a part of her wealth to her son, J. Paul, to treat and handle in all respects as if he were the absolute owner with absolute and uncontrolled power and discretion as to control and disposition, but only under an arrangement whereby there would be impressed on his conscience a cautious and conservative attitude, in contrast to the manner in which she believed he handled his other assets. The purpose of the arrangement was primarily to preserve and enhance a capital and corpus for distribution to his descendants and also to provide some cash income to J. Paul during his lifetime. Her gift was conditioned on J. Paul adding to the fund a part of his own assets to be handled in the same cautious and conservative manner and for the same purposes.

---

[4]Most of these facts were derived from the deposition of J. Paul that Gordon attempts to dismiss as a self-serving document. However, it is well established that the deposition of a party is substantive evidence (Witkin, Cal. Evidence (2d ed. 1966) § 1146, p. 1063). Furthermore, the circumstances that led to the creation of the trust, as set forth in the deposition, are totally consistent with two other exhibits, J. Paul's book "History of the Oil Business of George F. and J. Paul Getty," copyright 1941, and the protest he filed with the federal government in 1938 as to the taxes on Sarah's estate, in his capacity as executor. Both of these documents predated the instant controversy by over 20 years.

Sarah's purpose in agreeing to create the trust and in contributing to it was to place upon J. Paul constraints of prudence and caution in the handling of the oil business originally built up by her late husband to hold the business together by putting her son under fiduciary responsibilities. J. Paul's purpose was to obtain control of the notes of George F. Getty, Incorporated, held by his mother, since that outstanding debt of that corporation weakened its credit position and was a hindrance to his plans for expansion of the oil business. The purpose and intention of both J. Paul and Sarah was to preserve the business and always to build up, consolidate and hold control of it as a growth enterprise and never by any means to dissipate that control or any part of it.

In 1934, J. Paul owned all the capital stock of a corporation then named George F. Getty, Incorporated, and Sarah owned five promissory notes, each for $500,000, made by the corporation and payable to her, totalling $2,500,000. On Christmas Day 1934, in Los Angeles, Sarah and J. Paul entered into an oral agreement for the joint establishment of an irrevocable[5] *inter vivos* spendthrift trust to which each, as a trustor, would contribute assets. Sarah agreed to contribute the $2,500,000 of promissory notes; J. Paul, to contribute about $1,000,000 of his stock in George F. Getty, Incorporated. They further agreed that the income from the trust corpus contributed by Sarah would go to J. Paul for life and that he would irrevocably waive the income from the assets that he was to contribute to the trust corpus.

On December 31, 1934, pursuant to the oral agreement, J. Paul received from his mother, irrevocably transferred to him, the five promissory notes. He concurrently executed a written document entitled "Declaration of Trust," stating that he received the notes in trust under the terms of the declaration. Sarah appended to the document her written consent and ratification.

Articles IV, VI and VII of the declaration provided that J. Paul was the sole income beneficiary during his lifetime, and that after his death, the income should go in certain proportions to his children and to the offspring of his children per stirpes. The trust was to cease when J. Paul and his sons

---

[5]The irrevocability of the trust was established in 1940, pursuant to a judgment (Los Angeles No. 452368) by a proceeding in which Sarah, J. Paul and all other beneficiaries were parties, the then minors being represented by guardians ad litem. At this time, the trust declaration was reformed to add the words: "The trust or trusts created and provided for in this declaration of trust is and are and always shall be absolutely irrevocable in all respects and for all purposes and may not be revoked or cancelled under any circumstances or at any time by any party or parties whomsoever alone or together with any other party or parties whomsoever."

were all dead and the trust corpus then distributed among J. Paul's grand-children.

On the same day, December 31, 1934, J. Paul (pursuant to the powers to sell or contribute property to the trust) had one of the five notes for $500,000 reissued as two notes (one for $350,000 and one for $150,000) and sold to the trust 1,005.4 shares of stock of George F. Getty, Incorporated, in consideration of the transfer to him of the $350,000 note. Concurrently, J. Paul, as a trustor, also contributed to the trust 2,494.6 shares of stock of George F. Getty, Incorporated. The sale and contribution to the trust were effected by J. Paul's transferring to himself as trustee by a written instrument 3,500 shares of stock of George F. Getty, Incorporated. At this time, the fair market value of the 2,494.6 shares of stock contributed to the trust by J. Paul as trustor was $868,420; J. Paul subsequently paid the United States government a gift tax thereon.

Thus, at the time of creation, the trust corpus consisted of: 1) the $2,-150,000 of promissory notes of George F. Getty, Incorporated, contributed by Sarah; and 2) the 3,500 shares of stock of George F. Getty, contributed by J. Paul (the total of the 2,494.6 shares contributed and the 1,005.4 shares purchased by him, as indicated above.)

Article V of the declaration of trust empowered J. Paul to waive his right to receive or have paid to him the whole or any part of the net income of the trust. Pursuant to that power and in performance of the oral agreement of December 25, 1934, with Sarah, J. Paul irrevocably waived his right to receive or have paid to him all of the net income of the 3,500 shares of stock of George F. Getty, Incorporated, by a written instrument stating that he "does hereby waive his right to receive or have paid to him all of the net income of the . . . 3500 shares." The waiver further provided that the net income, so waived, "shall be paid and distributed by the trustee to the person or persons and in the manner in which said declaration of trust provided for the payment and distribution of the entire net income of the trust from and after the death of said J. Paul Getty." Except for a waiver of certain income received by the trust in 1938 and 1939, J. Paul never waived any income on any other asset or corpus in the trust. J. Paul and all other parties to the trust and all parties interested in it always interpreted the waiver of December 31, 1934, as applying only to income received on the 3,500 shares of George F. Getty, Incorporated (or any on any assets derived from or traceable to these 3,500 shares) and as providing that the waived income should go to the person or persons who would receive the income if J. Paul were already dead at the time of receipt of the income by the trust.

In entering into the agreement of Christmas Day 1934 and in executing and ratifying the documents of December 31, 1934, neither J. Paul nor Sarah intended to include in income or treat as income stock splits or stock dividends on any stock ever held in the trust or stock received as a result of any capital reconstitution or spin-off. At all times, both J. Paul and Sarah understood and intended that all provisions relating to *income, net income,* and *waiver thereof,* to *refer only to cash,* and any and all forms of accretion on or receipts by the trust derived from the original corpus were to go into and become part of the corpus for distribution to the remaindermen, except for cash income.

Neither Sarah nor J. Paul had any intention to provide income for J. Paul's children by means of the *inter vivos* trust established on December 31, 1934. The purpose of J. Paul's waiver of income on the assets he contributed to the trust (as well as the purpose of the agreement with his mother that he would make that waiver) were to effectuate his contribution to the trust. Inasmuch as he, as trustee, would continue to hold legal title to the assets he contributed to the trust, it was deemed necessary to deprive him of any beneficial interest in those assets in order to effectuate his contribution, both in law and as a matter of practicality.

It was the unquestioned purpose and intention, both of Sarah and J. Paul, to preserve and protect the trust fund in its entirety, to preserve the corpus at all times, and never to permit anything that would diminish the proportionate interest of the trust in the business enterprises in which it held stock. Both Sarah and J. Paul intended that the trust be a vehicle to maintain control of the underlying corporate assets that might become a part of the corpus. Control could not be maintained if stock dividends, stock received on splits, capital reconstitution or spin-offs did not remain a part of the trust corpus.

In 1951 and 1953, Getty Oil Company distributed one for 10 stock dividends; in 1954, 1955, 1956 and 1957, it distributed one for 20 stock dividends. In 1951 and 1957, it split its stock 3 for one in 1951 and 2½ for one in 1957. By these stock splits and stock dividends, the trust received additional shares of stock of Getty Oil Company, but the interest of each stockholder of Getty Oil Company remained unaltered in nature and size and merely became evidenced by a greater number of shares.

All of the stock of Getty Oil Company received by the trust as the result of the stock dividends, stock splits, reconstitution of capital structure, issuance and subsequent exchange of preferred stock for common stock and spin-offs, was placed by J. Paul as trustee in the corpus of the trust and was

consistently kept and treated at all times as part of the corpus. No part has ever been treated as income or distributed as income to anyone. All cash dividends at any time received by J. Paul as trustee were duly and properly distributed to those entitled to them in full conformity with the provisions of the trust.[6]

Preliminarily, we note that Gordon does not argue that the findings and judgment are not supported by the evidence. Rather, he asserts that since most of the evidence was documentary, this court can and should weigh the evidence. ■ It is well settled that where, as here, conflicting extrinsic evidence was presented, if there is any substantial evidence to support the trial court's conclusion, including inferences it could reasonably draw, the appellate court will adhere to the interpretation placed by the trial court on the writings and conduct of the parties (*Bradley* v. *Superior Court,* 48 Cal.2d 509, 516 [310 P.2d 634]).

Gordon's assertion that J. Paul was not a trustor is so patently contrary to the record that we do not need to dignify it by extensive discussion. ■ An *inter vivos* trust can be created either by agreement or by a unilateral declaration of the person who assumes to act as trustee. Here, the trust was created by J. Paul's unilateral declaration to which Sarah appended a concurrence and his transfer to the trust of the 3,500 shares (I Scott on Trusts (3d ed. 1967) §§ 17, 17.1, pp. 174-176; 4 Witkin, Summary of Cal. Law (1960) Trusts, § 4, p. 2890). The unilateral form was used as J. Paul was both trustee and trustor. *Wells Fargo Bank* v. *Greuner,* 226 Cal.App.2d 454 [38 Cal.Rptr. 132], cited by Gordon, is not in point. In any event, the creation of the trust pursuant to a binding agreement between Sarah and J. Paul is also res judicata on the basis of the 1940 Los Angeles court action No. 452368, in which all pertinent parties were represented. The findings and judgment in that action indicated that the trust was created by both Sarah and J. Paul and is binding on all of the parties herein (*Welsh* v. *Koch,* 4 Cal.App. 571 [88 P. 604]).

---

[6]The declaration of trust provided that the entire net income received by the trustee from the trust estate and available to income beneficiaries for distribution must be paid and distributed by the trustee monthly, quarterly, or semiannually, but in any event annually, except that if a beneficiary were a minor, the trustee might accumulate that beneficiary's share of income until he reached the age of 25 years but that the trustee must then pay the income to or apply it for the beneficiary not later than the time when that beneficiary attained the age of 25 years. The obligation of the trustee to pay income to income beneficiaries was not merely to pay on demand or to pay without any fixed terminal date by which the performance must occur. The obligation was to pay and distribute income to income beneficiaries by a fixed and certain terminal date; viz., in the case of income payable to a minor no later than his attaining the age of 25.

■ Gordon next asserts that J. Paul's waiver of net income included the stock dividends. The contention overlooks the purpose and express terms of the trust instrument. As indicated above, the trial court correctly concluded that both Sarah and J. Paul had, as the common purpose of creating the trust, to hold and maintain the control of the Getty Oil Company by making the trust the majority stockholder of the business. J. Paul as trustee was vested with extensive powers and almost absolute discretion not given to any of the successor trustees.[7] As the instrument also provided for termination of the trust only on the death of J. Paul and his children with the corpus then to be distributed to his grandchildren and other heirs, there was clearly no intent to create a trust on behalf of Gordon and his brothers. By her will, Sarah created testamentary trusts for her grandchildren whereby each received the income until the age of 30 and then received the corpus.

The eventual distribution of the trust corpus to J. Paul's grandchildren and their descendants could only be accomplished if the profits of the business were constantly reinvested and not distributed. The preservation and protection of the trust's control of the oil companies could only be achieved by treating the stock dividends as corpus. If the stock dividends were distributed as income, the controlling interest in the corporations would be diminished and might disappear as the value of the interest fluctuates (III Scott on Trusts (3d ed. 1967) § 236.3, p. 1986). A trustor's intent to retain a proportionate controlling interest in a corporation by allocating stock dividends to corpus will be given effect (*Estate of Sloan*, 222 Cal.App.2d 283 [35 Cal.Rptr. 167]).

Furthermore, since J. Paul was a trustor as well as a trustee, his own conduct before any controversy arose is persuasive evidence of his intent (Civ. Code, § 3535; *Davenport* v. *Davenport Foundation*, 36 Cal.2d 67, 73-74 [222 P.2d 11]). The uncontroverted evidence indicates that as the stock dividends were declared at all times after the creation of the trust and through the various corporate reorganizations, all of the stock dividends were allocated to the corpus of the trust in order to retain the trust's controlling share.

Gordon's contention that stock dividends were largely unknown at the time of the creation of the trust hinders rather than helps his argument.

---

[7]His powers were sufficiently extensive to be construed as a power to determine what was principal and what was income (*Estate of Bixby*, 55 Cal.2d 819 [13 Cal. Rptr. 411, 362 P.2d 43]). Exercising this power to treat the stock dividends as corpus was consistent with the purpose of the trust (*Estate of Jacks*, 80 Cal.App.2d 562 [182 P.2d 605]).

If so, neither Sarah nor J. Paul could have meant to include them in the term "net income" as used in the trust documents. We think, however, that there is a more reasonable explanation for the omission of any reference to stock dividends in the trust. As noted by Scott, *supra,* stock dividends are likely to be declared in times of general prosperity when values are inflated. Here, the trust was created during a period of economic depression when values were deflated.

Gordon's additional argument based on the beginning of Article IV, set forth below,[8] is likewise without merit. As preceding Article III directed the trustee to first discharge all taxes, assessments, etc., the phrase "entire net income" in the first sentence of Article IV merely refers to the amount remaining after the payments made pursuant to Article III. Nor can Gordon predicate his argument on the term "net income" as used in the waiver. By its express terms, the waiver was limited to "all of the net income of the deposited 3,500 shares of George F. Getty, Incorporated." J. Paul testified that his understanding of the term "net income" was "cash." The term "net income" must be given the commonly used and accepted meaning unless the document indicates a different meaning (*Estate of Davis,* 75 Cal.App.2d 528, 533 [171 P.2d 463]).

Gordon next argues that pursuant to the Pennsylvania rule, set forth below,[9] applicable to trusts created before 1941 (the date of the adoption

---

[8]"The entire net income received from the trust estate and available for distribution shall be paid and distributed by the trustee, either monthly, quarterly or semi-annually as the circumstances and condition of the trust estate will most conveniently permit, but in any event annually, as follows, to-wit:

"(1) While said J. Paul Getty is living, all of said entire net income shall be so paid to him;"

[9]"With respect to the rights of life tenants and remaindermen to the income or proceeds of trust property, the Pennsylvania rule disregards the character of the receipt as a cash dividend, a stock dividend, or an extraordinary dividend or distribution, and looks only to the period of time during which the dividend or other distribution was earned by the declaring corporation. If it is found that the dividend or other distribution represents earnings wholly earned before the commencement of the life interest, the rule awards the entire dividend, whether payable in stock or in cash, to the corpus of the trust. On the other hand, if it is found that the dividend or other distribution represents earnings wholly earned after the life interest attached, it is awarded entirely to income. Likewise, if the dividend or other distribution has been accumulated from earnings earned partly before the establishment of the life interest, and partly after, the rule calls for an apportionment of the dividend or other distribution between life tenant and remainderman, according to their respective interests. [Citations.]" (*Estate of Talbot,* 269 Cal.App.2d 526, 533 [74 Cal.Rptr. 920].) If the income beneficiaries sustain the burden of showing on an analysis of the affairs of the corpus that the stock dividends stemmed from earned income, then a proportionate amount of the stock dividend is treated as income. Gordon asserts that the evidence of Mr. Walsh was pertinent on this point. However, the record indicates that the trial court thought otherwise as it specifically refused to make a finding on this issue.

by this state of the Uniform Principal and Income Act), the stock dividends should have been almost entirely allocated to income. However, as this court (Division One) held in *Estate of Starr,* 197 Cal.App.2d 582 [17 Cal. Rptr. 240], the intent of the trustor governs and overcomes all of the presumptions created by the rule. As we have fully discussed the intent of the trustors here and concluded that J. Paul's allocation of the stock dividends was in accord with this intent, we need not consider the parties' extensive arguments about the Pennsylvania rule.

■    Gordon's second major contention on appeal is that the ratio of trust assets to which J. Paul's waiver of income applied was erroneously changed from the original 36 percent to 20.70776 percent, as found by the trial court.

The following facts, as found by the trial court, are pertinent: Article I of the declaration of trust gave the trustee the power to invest and reinvest the corpus and to substitute other property therefor, including the power to participate in reorganizations, consolidations and mergers. Pursuant to that power, J. Paul effected a series of changes and corporate reorganizations and stock exchanges. By 1958, the trust had become the owner of 233,140 shares of common stock of Getty Oil Company, as outlined below.[10]

---

[10] In 1935, the notes for $2,150,000 were sold and the proceeds used to purchase all the stock of George F. Getty Oil Company (hereafter Oil Company), all the stock of George F. Getty Petroleum Corporation (hereafter Petroleum Corp.) and an option to buy certain shares of Tidewater Associated Oil Company (hereafter Tidewater). On December 30, 1936, a statutory consolidation of George F. Getty, Incorporated, the Oil Company and the Petroleum Corporation was effected, whereby the net assets of these three companies were acquired by a new corporation named George F. Getty, Inc. On the same date, J. Paul, as trustee, exchanged the 3,500 shares of stock of George F. Getty, Incorporated, for 9,344.125 shares of stock of George F. Getty, Inc., and exchanged the trust's holdings of stock of the Oil Company and the Petroleum Corporation for 35,779.775 shares of stock of George F. Getty, Inc. By these mesne substitutions the $2,150,000 of promissory notes contributed by Sarah became 35,779.775 shares of George F. Getty, Inc.

In May 1946, George F. Getty, Inc. merged into Pacific Western Oil Corporation (hereafter Pacific Western) and the stock of George F. Getty, Inc. was exchanged for stock of Pacific Western at a ratio of 15½ shares to one. The 9,344.125 shares of George F. Getty, Inc. held by J. Paul as trustee and derived from the 3,500 shares of George F. Getty, Incorporated, on which J. Paul had waived income, were exchanged for 144,833.9375 shares of Pacific Western and the 35,779.775 shares on which he had never waived income, plus 1/10th of a share purchased by the trustee in 1937 for $10 were exchanged for 554,588.0625 shares of stock of Pacific Western. Thus, by May 1946, the trust became the owner by exchange of 144,833.9375 shares of stock on which J. Paul had waived income and of 554,588.0625 shares on which he had not waived income, or a total of 699,422 shares of stock.

In 1950, the capital structure of Pacific Western was reconstituted by amendment

As a result of these stock splits and stock dividends, the trust became the owner of 7,715,132 shares of common stock of Getty Oil Company. As a result of the exchange of preferred stock for common in 1958, its total holdings of Getty Oil Company stock became 7,948,272 shares; 20.70776 percent (1,645,900.18 shares) derived from the 3,500 shares of George F. Getty, Incorporated, on which J. Paul waived income; and 79.29234 percent (6,302,371.82 shares) derived from the $2,150,000 of promissory notes of George F. Getty, Incorporated, on which J. Paul never waived income. Of the 1,645,900.18 shares to which J. Paul's waiver applies, 1,173,126.29 shares constitute assets that he contributed to the trust.

As of December 31, 1966, the portion of the trust corpus as to which J. Paul had waived the right to income and the portions thereof as to which he had not waived the right to income, were as follows: 1) 1,645,900.1784 shares of the common stock of Getty Oil Company and 82,294.8857 shares of the common stock of Spartan Aircraft Company, as to which J. Paul had waived the right to income; 2) 6,302,371.8216 shares of the common stock of Getty Oil Company and 315,118.1143 shares of the common stock of Spartan Aircraft Company as to which J. Paul had never waived the right to income. The 397,413 shares of Spartan Aircraft Company were received by the trust in 1959 by virtue of its holdings of stock of Getty Oil Company as a spin-off of shares of Spartan Aircraft Company received by Getty Oil Company on liquidation of Getty Realty Corp., a wholly owned subsidiary of Getty Oil Company. Spartan Aircraft Company has changed its name to Minnehoma Financial Company.

Gordon contends that simply because at the time of the creation of the trust the 3,500 shares of stock contributed by J. Paul constituted 36 percent of the trust corpus,[11] this figure had to be maintained for the duration

---

of its certificate of incorporation to convert part of its capital stock into preferred stock. The preferred stock was issued to the corporation's stockholders in amounts equal to their common stock holdings so that each stockholder's interest in the capital stock became represented by equal amounts of common and preferred shares. By the reconstitution of capital, issuance of preferred stock, and later exchange for common stock, the interest of each stockholder of Pacific Western remained unaltered in nature and size but merely became evidenced by a greater number of shares. The trust received 699,422 shares of preferred stock.

In 1956, Pacific Western changed its name to Getty Oil Company. In 1958, Getty Oil Company offered to exchange common stock for its preferred stock, at a ratio of one share for three. J. Paul, as trustee, made the exchange and received *233,140 shares of common stock* for the preferred stock.

[11] The basis of this contention is that on December 31, 1934, the 3,500 shares were worth $1,218,420; if the face amount of the notes, $2,150,000, is added to this amount, the value of the trust assets was $3,369,420 at the time of creation; $1,218,420 is 36 percent of $3,368,420.

of the trust. This contention is entirely without merit. As indicated above, the waiver of a portion of the trust corpus signed by J. Paul was not in terms of a particular percentage of the corpus but only as to the income on the 3,500 shares that he had contributed. As described above, by 1958, these 3,500 shares, through a series of corporate reorganizations and stock exchanges, had become 1,645,900.18 shares of Getty Oil Company stock, while the remainder of the trust corpus was comprised of the 6,302,371.82 shares of stock of Getty Oil Company that were derived from the promissory notes contributed by Sarah. The 1935-1936 transaction, whereby the trust acquired the shares of several companies and the Tidewater option in consideration of the cancellation of the notes, was the basis for the enormous growth of the value of the trust to nearly half a billion dollars at the time of trial.[12] The fact that this portion of the corpus grew at a greater rate than that contributed by J. Paul was the result of his management and business acumen but did not confer on Gordon any right to income on any portion of the corpus on which J. Paul had not waived the income.

In any event, the matter of the proportion to which J. Paul waived income is concluded by the doctrine of collateral estoppel. The record indicates that in 1941, J. Paul resigned as trustee to go into war work and appointed several successor trustees. In 1948, the successor trustees resigned and J. Paul again became trustee pursuant to Los Angeles Superior Court action No. 542151. That judgment, which included all pertinent parties, approved and settled the accounts of the trustees and a copy, attached as Exhibit 3 to the cross-complaint, was admitted by Gordon's answer as being a true copy by failure to deny. At the trial of the instant matter, an exhibit was introduced that was a true copy of the accounts settled in the 1948 action. This account indicates that the income received by way of cash dividends was distributed 20.70776 percent to the sons and 79.29234 to J. Paul. Thus, Gordon, who was represented by his guardian ad litem in the 1948 matter, is bound under the doctrine of colleteral estoppel (*Braye* v. *Jones,* 129 Cal.App.2d 827, 830 [278 P.2d 29]).

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.

A petition for a rehearing was denied December 27, 1972.

---

[12]By the time of the oral argument on this appeal, according to J. Paul's attorney, the trust was worth about one billion dollars.