James V. McCONNELL and Margot Murphy McConnell, Appellants,

v.

PICKERING LUMBER CORPORATION, Appellee.

No. 13602.

United States Court of Appeals, Ninth Circuit.

Nov. 18, 1954.

Rehearing Denied Dec. 21, 1954.

---

Herbert Bartholomew, Pemborke Gochnauer, San Francisco, Cal., for appellant.

John F. Downey, Ralph R. Martig, Downey, Brand, Seymour and Rohwer, Sacramento, Cal., Charles E. Whittaker, Watson, Ess, Whittaker, Marshall & Enggas, Kansas City, Mo., for appellee.

Before DENMAN, Chief Judge, and HEALY and POPE, Circuit Judges.

HEALY, Circuit Judge.

This is a diversity case involving in major part the local interpretation of section 3399 of the California Civil Code, relating to the reformation of contracts.[1]

Appellants, citizens of New York, brought suit against appellee, a Delaware corporation with its principal offices in Kansas City, to recover upon a written contract, copy of which was attached and made a part of the complaint. As an alternative to recovery on the contract as written, reformation was asked on grounds of mutual mistake or "mistake of plaintiffs known or suspected by defendants." The court on motion of appellee dismissed the complaint for failure to state a claim upon which relief can be granted. On application of appellants the order of dismissal was vacated and leave to amend given. An amended complaint, omitting the allegation of mutual mistake but retaining that of unilateral mistake, was then filed. Motion to dismiss was again interposed, and the court entered an order stating its belief that a ruling thereon should be deferred until trial. Appellee then answered, and thereafter, prior to trial, an order directing a dismissal was entered; and some two weeks later there followed a judgment of dismissal with prejudice.

Following is a summary of the allegations of the amended complaint: Appellee corporation was engaged in the timber business in California. The corporation, appellant Mrs. Margot Murphy McConnell, and five individuals residing in Michigan, held in undivided ownership 154 parcels of California timberland aggregating 6,172 acres. The tract is commonly known as the "McArthur and Ducey lands." Mrs. McConnell owned an undivided 248.2/1360ths interest (1126.33 acres if divided), appellee an undivided 272/1360ths interest (1234.-336 acres if divided), John F. Ducey an undivided 494.8/1360ths interest (2245.-402 acres if divided) and the four others owned collectively an undivided 345/1360ths interest (1565.610 acres if divided).

Appellee desired to buy the interests of its co-owners. It prepared the written agreement in question covering purchase of appellants' interest at a price of $75 an acre. The agreement was executed by the parties in April of 1946. It contained an escalator clause, reading:

"10-(A)—Should Purchaser at any time prior to July 1, 1950 acquire the 494.8/1360 fractional interest of John F. Ducey in the property listed in Schedule A from him, his heirs or assigns or representatives, directly or indirectly, or at a partition sale of all the property described in Schedule A at a price higher than that provided herein for Sellers' interest, then Purchaser and Sellers hereby agree that the price provided in this contract for

[1]. Section 3399 of the California Civil Code provides:

"When contract may be revised. When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

the Sellers' interest shall forthwith be adjusted upward by the amount necessary to make up the difference."

(Schedule A referred to is a description by legal subdivisions of the entire tract of 6,172 acres.)

In 1949 appellants discovered that appellee had acquired in 1947 the 494.8/1360 fractional interest of Ducey in 40 of the 154 parcels listed in Schedule A, the acquisition being allegedly at a price greatly in excess of $75 and believed to be approximately $150 per acre. Appellee has made no payment to appellants under the price escalator clause nor notified appellants of the purchase. This failure is believed to be based on appellee's contention that the escalator clause is inoperative because appellee did not acquire the fractional interest of Ducey in all 154 parcels but only in 40 parcels.

It is then alleged that if the clause be construed to mean that appellee must buy before July 1, 1950 the interest of Ducey in all of the property listed in Schedule A, then it was executed by appellants under a mistake on their part as to the meaning and effect of the language of the clause, which mistake was known or suspected by appellee at the time of the execution of the contract. When appellants executed the contract it was their understanding that section 10-A meant that they would receive for their interest in the lands an amount equal to the difference between $75 per acre and any higher price per acre provided in any agreement between appellee and Ducey made prior to July 1, 1950, for the sale of Ducey's interest "in all or any" of the lands.

Appellants were induced into this mistake by the following circumstances: After appellee acquired its interest in the tract in 1944, and in order for it to cut timber on any of said lands, it began negotiations to buy out the interests of all the other owners. These negotiations were largely carried on by the appellants and appellee. All co-owners except Ducey were willing to sell if a fair price could be obtained. In March of 1945 appellant Mrs. McConnell went to Detroit, met with all of her co-owners, and they agreed to sell their interests at a price of $75 per acre, which fact was made known to appellee. In June of that year appellee prepared and submitted a proposed contract at this price containing substantially all the provisions of the contract at issue except the escalator clause. Ducey refused to sign this contract. Thereupon appellee entered into negotiations with appellants for the purchase of their interest and informed appellants that the acquisition of their interest would improve the corporation's position in the event of a partition suit. Appellants refused to sell their interest at $75 per acre unless protected against the acquisition by appellee of any of the other interests at a higher price per acre. This demand was subsequently narrowed to include only the interest of Ducey in view of the size of his fractional interest and his past unwillingness to sell.

In February of 1946 all the other co-owners offered to sell their interests to appellee for $100 per acre, which fact was made known to appellants. In the same month appellee's president proposed to appellants in New York that they enter into two contracts, one at $75 per acre which would be shown the other co-owners, and another at a higher price per acre which would be a private agreement between them. Appellants refused to consider this. It was thus apparent to appellants that appellee desired to acquire all outstanding interests in the property and appellants believed that it would do so prior to July 1, 1950 at a price or prices in excess of $75 per acre. Thereafter the parties hereto entered into the contract in controversy.

In July of 1951 appellants learned that appellee had agreed prior to July 1950 with all the co-owners other than Ducey for the acquisition by appellee of all of their respective interests in all of the lands, and on information and belief it is alleged that the interests were ac-

quired at a price or prices in excess of $75 per acre.

The final paragraph of the amended pleading we quote verbatim: "The contingency of the purchase by defendant corporation of the fractional interest of John F. Ducey in a part of but less than all of said lands was not discussed during the negotiations between plaintiffs and defendant corporation, but the plaintiffs at all times prior to, and at the time of executing said agreement understood and believed and defendant corporation at all said times knew or suspected that plaintiffs under the terms of said agreement understood and believed that plaintiffs would receive the difference between $75.00 per acre and any higher price per acre which might be agreed upon between defendant corporation and John F. Ducey at any time prior to July 1, 1950."

A money judgment was prayed in the amount of the difference between $75 an acre and the amount per acre that Ducey had received. It was asked that in the event the language of the contract was determined not to mean what appellants claim it means, then the escalator clause be reformed to conform with the actual agreement of the parties by addition of the words "any of" after the word "in" and preceding the words "the property listed" in the third line of paragraph 10-A of the agreement—that is to say, the clause should by reformation be made to read "Should Purchaser at any time prior to July 1, 1950, acquire the 494.8/1360 fractional interest of John F. Ducey in any of the property listed in Schedule A" etc.

■ The trial court held that the asserted ambiguity in the escalator clause does not exist, and we experience no difficulty in agreeing with the holding. The clause says that should appellee at any time prior to the date mentioned "acquire *the* 494.8/1360 fractional interest of John F. Ducey *in the property listed in Schedule A,*" then the escalator provisions shall become effective. As previously noted the property listed in the Schedule embraces all the property

in the tract. The clause is to be taken as meaning what it plainly says.

Appellants stress the circumstance that appellee drew the contract and that under all authorities any ambiguity therein is to be resolved against the drawer. In this connection they argue, as we understand them, that the instrument though unambiguous on its face contains a latent or extrinsic ambiguity which subsequent events have disclosed. They say, for example, that an absurdity would result if appellee had purchased the Ducey property in all except one, or a fraction of one, of the 154 parcels at a price in excess of $75 per acre. However, no situation of that sort confronts us. No surrounding facts or circumstances importing a latent or extrinsic ambiguity are pleaded in the complaint, nor is fraud relied on. What was in fact acquired was Ducey's fractional interest in 1599.22 acres, namely his interest in approximately 25% of the total acreage in the entire tract. This transaction in itself would not seem to render the agreement ambiguous or doubtful in meaning. And a careful study of the contract in its entirety discloses no provision or phraselogy tending to becloud the plain meaning of the disputed clause.

■ Appellants would have the court under the guise of construction add words to the contract which are not to be found in it. We do not understand such to be the function of the court. Consult United Iron Works v. Outer Harbor, etc., Co., 168 Cal. 81, 141 P. 917. In Barnhart Aircraft, Inc., v. Preston, 212 Cal. 19, 23, 297 P. 20, 22, the court quoted with approval the following language of Jones in his Commentaries on Evidence, Vol. 3, section 454: " ' * * * Ambiguity in a written contract, calling for construction, may arise as well from words plain in themselves but uncertain when applied to the subject matter of the contract, as from words which are uncertain in their literal sense * * *. Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful.

It must be borne in mind that although declarations of the parties may in some cases be received to explain contracts or words of doubtful meaning, yet no other words can be added to or substituted for those of the writing.. The courts are not at liberty to speculate as to the general intention of the parties, but are charged with the duty of ascertaining the meaning of the written language.' "

■ Turning now to the matter of reformation, our function is to inquire how the California courts have applied the statute quoted in footnote 1, supra, more particularly in suits predicated on mistake of one party known or suspected by the other. Concretely, the question is whether the party seeking reformation on that ground must show an antecedent agreement or intention of the parties to which the writing can be reformed. Here there is no allegation of a pre-existing agreement or understanding of the parties that the price was to be adjusted in the event the Ducey interest was acquired in any of the listed property at a higher price. On the contrary the pleading appears to negative the existence of an antecedent agreement on that subject. As already seen, the allegation is that "the contingency of the purchase by defendant corporation of the fractional interest of John F. Ducey in a part of but less than all of said lands was not discussed during the negotiations between plaintiffs and defendant corporation * * *."

Appellants concede that it is essential in cases of asserted mutual mistake to show an antecedent agreement to which the writing can be reformed. But they say that such is not the rule in the case of unilateral mistake, although they confess having found no California authority so holding. They rely largely on Eagle Indemnity Co. v. Industrial Accident Commission, 92 Cal.App.2d 222, 206 P.2d 877, where reformation of an insurance policy was upheld for mistake of one party known to the other, the court saying at page 229 of 92 Cal.App.2d at page 881, or 206 P.2d that "the con-tract which was intended by the party acting under unilateral mistake known or suspected by the other, is, as a matter of law, the contract of the parties." The decision is of no help to appellants. The holding was that an insurer is charged with knowledge of its general agent as to compensation coverage intended to be effected by an insured employer and omitted from the policy later issued. The case, in short, is one where there was an antecedent understanding or agreement between the insured and the authorized agent of the insurer with respect to coverage.

A study of the local decisions cited in the briefs, together with others which we have consulted, leaves us wholly unconvinced of the soundness of appellants' thesis. These cases have uniformly involved factual situations whereby the contract as reformed corresponded with a prior agreement between the parties. See particularly F. P. Cutting Co. v. Peterson, 1912, 164 Cal. 44, 50, 127 P. 163; Burton v. Curtis, 1928, 91 Cal.App. 11, 13, 266 P. 601; Bank of America of California v. Granger, 1931, 115 Cal.App. 210, 220, 1 P.2d 479. California Jurisprudence is in accord with the view indicated by the cases. It states that "The plaintiff must allege the true agreement between the parties * * * The plaintiff must allege that the parties agreed to the terms of the contract as sought to be established." 22 Cal.Jur. § 19, pp. 734–735. In Auerbach v. Healy, 174 Cal. 60, 62, 161 P. 1157, 1158, the court said: "The rules of pleading in actions for the reformation of contracts are well established and should be familiar. The complaint should allege 'what the real agreement was, what the agreement as reduced to writing was, and where the writing fails to embody the real agreement.' 34 Cyc. 972".

■ The most recent, and at the same time the most conclusive, expression on the point is found in Bailard v. Marden, 36 Cal.2d 703, 227 P.2d 10, decided in 1951 by a unanimous court. In that instance both mutual mistake and uni-

lateral mistake were alleged. The court said, 36 Cal.2d at pages 708–709, 227 P.2d at page 13: "The purpose of reformation is to effectuate the common intention of both parties which was incorrectly reduced to writing. To obtain the benefit of this statute, it is necessary that the parties shall have had a complete mutual understanding of all the essential terms of their bargain; if no agreement was reached, there would be no standard to which the writing could be reformed. Otherwise stated, '[I]nasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, a definite intention or agreement on which the minds of the parties had met must have pre-existed the instrument in question.' 45 Am.Jur. § 7, p. 586; Holmes v. Anderson, 90 Cal.App. 276, 265 P. 1010; 5 Williston, Contracts [rev. ed.], § 1548, p. 4339; Rest., Contracts, § 504, comment b. *Our statute adopts the principle of law in terms of a single intention which is entertained by both of the parties.* 'Courts of equity have no power to make new contracts for the parties, * * * [N]or can they reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding.' (22 Cal.Jur. § 2 p. 710.) If this were not the rule, the purpose of reformation would be thwarted." [Emphasis supplied.]

Appellants assert error in the dismissal of their amended complaint under the circumstances outlined in the forepart of this opinion. They say they should have been permitted to amend or given a trial on the facts. We are not able to say that error was committed in these respects. A period of two weeks elapsed between the order of dismissal and the entry of judgment of dismissal with prejudice. There appears to have been no application for leave to amend, nor do appellants claim that other facts which might have been pleaded were available.

Affirmed.