[No. B009022, B009025. Second Dist., Div. Seven. Dec. 12, 1986.]

J. RONALD GETTY, Individually and as Co-trustee, etc.,
Plaintiff and Appellant, v.
GORDON PETER GETTY, Individually and as Trustee, etc., et al.,
Defendants and Respondents.

1160

**COUNSEL**

Irell & Manella, Morgan Chu, Lawrence E. Goldenhersh, Hecht, Diamond & Greenfield, Ira D. Riskin, Valesi, Rose & Magaram, Philip S. Magaram, Morton Minikes and Richard N. Ellis for Plaintiff and Appellant.

Lasky, Haas, Cohler & Munter, Moses Lasky, Terry M. Gordon, Adams, Duque & Hazeltine, Robert W. Fischer, Jr., Butler, Dan, Allis & Reback, James G. Butler, Robert C. Reback, Latham & Watkins, Philip F. Belleville, Michael R. Whalen, Andrew H. Kopkin, Overton, Lyman & Prince, Edmond R. Davis, John A. Payne, Jr., Thomas M. McMahon, Milbank, Tweed, Hadley & McCloy, Edward M. Stadum and Alan D. Hamilton for Defendants and Respondents.

## Opinion

MACKEY, J.*—Plaintiff appeals from order sustaining demurrer without leave to amend to the second amended complaint for fraud and declaratory relief against the beneficiaries of a trust and for reformation of a trust, and from judgment of dismissal. Plaintiff also appeals from judgment entered against him in a suit for constructive trust against Gordon Getty as the trustee. These two appeals were consolidated.

The appeal is without merit and the judgment and order appealed from should be affirmed.

### FACTS

This case presents a fascinating factual history of one of the world's richest families, their lifestyles and their inner-family problems.

On December 31, 1934, J. Paul Getty (J. Paul) and his mother Sarah C. Getty executed a written inter vivos agreement called "Declaration of Trust." Both J. Paul and Sarah were trustors of the 1934 trust. The declaration of trust designated J. Paul as trustee; Sarah transferred to him as trustee $2.5 million of promissory notes of which she was the payee, and J. Paul transferred to himself as trustee $868,420 of value. The declaration of trust provided that the income be paid to J. Paul during his lifetime and after his death to his sons or their descendants in varying proportions. The older son George was born in 1924 by J. Paul's first wife. The second wife was Adolfine (Fini), a German national, whom J. Paul met in Europe in 1928, married and brought to the United States. She lived with him only a few months, left him, returned to Germany and there bore the plaintiff, Ronald, J. Paul's second son in 1929. She did not return to the United States and Ronald did not come to the United States until 1935, after the advent of Hitler. In the year of his divorce from Ronald's mother, J. Paul married the woman who became the mother of his third and fourth sons, Eugene P. (or Paul, Jr.) and defendant Gordon.

The declaration of trust made different provisions for the sons. It provided that Paul, Jr., and Gordon, the sons of the marriage current at the time, were to receive $9,000 per year and Ronald $3,000 with nothing in the first instance to go to George. The income in excess of $21,000 per year was to go in equal shares to George, Paul, Jr., and Gordon but none to Ronald. This case concerns present income for when the trust terminates at the death

*Assigned by the Chairperson of the Judicial Council.

of all J. Paul's sons, the corpus will be divided amongst the descendants of the sons per stirpes with a full one-quarter to Ronald's descendants.

The history of the prior trust litigation is as follows: (1) There was a 1940 suit to make the trust irrevocable for tax purposes when J. Paul sued Sarah seeking to reform the "Declaration of Trust." (*Getty I.*) The trust was reformed and found to be absolutely irrevocable and not subject to revocation or cancellation by any parties or under any circumstances at any time. Ronald was also a party to the reformation of the trust represented by his guardian ad litem Fini.

(2) There was also a 1941 supplement to the trust because the declaration of trust failed to include a provision for the disposition of the corpus in the event there might not be any descendants to receive the corpus on the death of the last of J. Paul's sons.

(3) There was a 1948 suit to permit J. Paul to revoke his resignation as trustee in 1941. (*Getty II.*) Ronald was 18 years old at this time. The trustees' accounts were settled and approved in that suit. Ronald was a party to that action represented by his guardian ad litem Fini.

(4) Ronald was also a party to the action in *Getty v. Getty* (1972) 28 Cal.App.3d 996 [105 Cal.Rptr. 259] (*Getty III*) and the trustees' accounts were settled in this litigation when plaintiff was 43 years old.

By the time of the trial, the trust consisted of approximately 32 million shares of Getty Oil with an annual dividend income of over $83 million and presently worth approximately $3 billion. The trust provides for Ronald's three brothers each to receive one-third of the trust income, which was approximately $27 million per year each immediately before the trial. Ronald receives exactly $3,000 per year.

The language of the trust is not in dispute. The fact that Sarah and J. Paul knew what was said by the language of the trust when they signed it is not in dispute.

### ISSUES PRESENTED

(1) Is the reformation action barred by the statute of limitations and laches?

(2) Is the reformation action barred by res judicata?

(3) Should the trust be reformed?

(4) Does Ronald as donee beneficiary have standing to seek reformation?

(5) Do the findings of the trial court establish the terms of the trust?

(6) Did the statement of decision comply with Code of Civil Procedure section 632?

(7) Was there a right to a jury trial?

(8) Are the beneficiaries estopped to assert the doctrine res judicata statute of limitations or laches?

A

DOES THE STATUTE OF LIMITATIONS BAR PLAINTIFF'S RECOVERY?

The law is quite clear that the applicable period of limitations in a suit based on fraud or mistake or for reformation for constructive trust is three years from the time when the fraud or mistake was or should have been discovered (Code Civ. Proc., § 338, subd. 3); therefore, under the facts of the case since this was a 1934 trust and suit was filed in 1979, this would be some 45 years after the original trust. Further, the suit was filed 25 years after the appellant reached the age of majority.

**(1)** The more serious question is if Fini and Ronald's reliance on the promise by J. Paul estops the defendants to assert the defenses of laches, statute of limitations and res judicata.

To reach a decision as to whether the defendant is estopped to assert the defenses of laches, the statute of limitations and res judicata, we must review some of the previous factual events.

There was the expectation that Ronald would inherit from his maternal grandfather, Dr. Helmle, a German industrialist, which was defeated when in 1937 Hitler arrested Helmle and confiscated his property. In the 1950's, Helmle, and later his daughter Fini, Ronald's mother, sought to obtain restoration from the German government but without success.

By 1940, J. Paul and his mother Sarah were aware of what happened to Dr. Helmle as the trial court in its statement of decision found as follows: "11. In 1940, before and at the time of Getty I, Sarah knew not only what the Declaration of Trust provided concerning Ronald and his brothers, but she also knew that after the execution of the Declaration of Trust in December, 1934, and more particularly in 1937, the Nazi government of

Germany had confiscated Dr. Helmle's property. The judgment entered in Getty I on June 27, 1940, constituted a complete adjudication of any and all rights of Sarah to revoke, reform, rescind, or otherwise alter or affect the trust, and exhausted her rights to do so. Any rights that Ronald might otherwise have to revoke, reform, rescind, alter, affect, or impose a constructive trust on the 1934 trust could only be derived from Sarah, but Ronald by his guardian *ad Litem*, his mother, was a party to that suit and is bound by the judgment. Ronald is precluded by the judgment in Getty I from seeking any such relief."

Sarah Getty died December 26, 1941, nearly 39 years before suit was filed. J. Paul died June 5, 1976, almost 35 years after his mother's death, and he was trustee in all that period, except for 7 years from 1941 to 1948. *For over 42 years* until his death, J. Paul, trustee and the other interim trustee from 1941 until 1948 distributed income to the beneficiaries in exactly the amounts required under the declaration of trust. Ronald reached his majority December 1950 and made no claim until about 25 years later.

Therefore, the statute of limitations began to run on the earliest date that Ronald can be charged with facts constituting the mistake.

Ronald is charged with knowledge as of 1940 that Sarah and J. Paul allegedly intended not to provide equally for him, because he claims that J. Paul made promises to rectify an inequality to his guardian ad litem, Fini Getty, in the course of *Getty I*. By virtue of his having been represented in that lawsuit, in which a copy of the trust instrument was appended to the complaint, Ronald had notice that the trust instrument provided that he would *not* share in the trust income equally with his brothers, and that the trust instrument did not make any reference to providing for him in some other fashion. Therefore, the period within which to seek reformation of the trust instrument expired in 1943. Even if the statute was tolled until Ronald reached the age of majority in 1950, the action was barred for more than 25 years when it was commenced in 1979.

No estoppel saves Ronald's case from the statute of limitations or res judicata or laches for two reasons:

First, it rests on the assumption that J. Paul made promises to Sarah in 1940, to Fini and in later years to Ronald contrary to the findings of the trial court.

Even if the alleged promises had been made, it would appear there would be no estoppel against the trust.

Also, J. Paul was not a trustee at the time of the 1948 conversation with Ronald. And even if he were a trustee, his authority, as trustee, was circumscribed by the trust instrument. Ronald could not rely on promises outside the scope of that authority and no promises made by J. Paul after the execution of the trust could enlarge or alter the trust. If J. Paul promised to "equalize" Ronald, he could not satisfy that promise *from either corpus or income* of an irrevocable trust which had been created in 1934. Any attempt to bind the trust by promises inconsistent with its terms would have been a breach of fiduciary duty.

The suit by Ronald against J. Paul's legatee may have been in time but his right against the trust cannot arise out of any promise of J. Paul made after the trust has been created.

### B

### LACHES

The same delay also bars Ronald's cause of action under the doctrine of laches. The essential elements of laches were stated in *Stafford v. Ballinger* (1962) 199 Cal.App.2d 289, 296 [18 Cal.Rptr. 568]: "The basic elements of laches are: an omission to assert a right; (2) a delay in the assertion of the right for some appreciable period; and (3) circumstances which would cause prejudice to an adverse party if assertion of the right is permitted. . . . [Citation omitted]"

Such prejudice results from the death of important witnesses, such as J. Paul and Sarah.

"'No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible.'" (*Garrity v. Miller* (1928) 204 Cal. 454, 458 [268 P. 622].)

The trial court specifically found that Ronald's delay was both unjustified and prejudicial.

"There has been a delay which is really not justified of many years. There is obvious prejudice.

"All or some of the most important witnesses including J. Paul Getty himself are long dead and gone so that the defendant has been deprived of the ability to use those witnesses." Therefore, Ronald's claims are barred by laches.

Ronald argues that he is not deprived of his legal rights by laches, statute of limitations or res judicata because he never expressly threatened his father with a lawsuit. Ronald relies on *Day* v. *Greene* (1963) 59 Cal.2d 404, 408 [29 Cal.Rptr. 785, 380 P.2d 385, 94 A.L.R.2d 802]. The findings in that case may be summarized as follows: "Colonel Greene and Mary orally agreed that he would leave everything to Mary in her lifetime and that upon Mary's death she would provide for Eva in such a manner that Eva would share with Mary's children share and share alike. In reliance on this agreement Colonel Greene 'seriously and unalterably' changed his position by abstaining from making *inter vivos* gifts or testamentary disposition to Eva and by leaving his entire estate 'before and at his death' to Mary. Mary accepted and retained the benefits of the agreement and thereafter breached it and unjustly enriched her children by disposing of her residuary estate solely for their benefit. A confidential relationship existed between Eva and Mary from the time of Mary's marriage to Colonel Greene until her death, and Eva relied on the agreement and did not attempt to enforce her claims in her father's estate until after she learned of the contents of Mary's will. . . ."

Mary died in 1955 leaving all of her property including the property she received from the Colonel to her children and Eva only received $2,500. Eva filed a complaint for constructive trust in 1957, more than 46 years after the transfer had been made but less than 3 years after Mary's death.

"The basis of the present action is that Mary violated confidential relationships with her husband and with Eva by failing to perform her part of the agreement after she had benefited from her husband's performance. Such a violation of a confidential relationship constitutes constructive fraud and where, as here, unjust enrichment results a constructive trust may be imposed." (59 Cal.2d at p. 411.)

In *Day*, plaintiffs' right arose out of a breach of contract by defendant, a second wife, to leave property by her will and the breach did not occur until her death. An estoppel can arise, if at all, only if there is "some element of fault or blame on the part of the party against whom the estoppel is asserted." (*Gamboa* v. *Atchison, Topeka & Santa Fe Ry. Co.* (1971) 20

Cal.App.3d 61, 65 [97 Cal.Rptr. 471].) Ronald is asserting a claim here, not against J. Paul's estate or his legatee in privity with him, but against the trust.

It is essential that a claim be made and that in reliance on words or conduct a suit to enforce a claim has been deferred. Unfortunately, Ronald never asserted a claim against his father. Ronald cites *Langdon* v. *Langdon* (1941) 47 Cal.App.2d 28 [117 P.2d 371]; *Lagomarsino* v. *San Jose etc. Title Ins. Co.* (1960) 178 Cal.App.2d 455 [3 Cal.Rptr. 80]; *Gaglione* v. *Coolidge* (1955) 134 Cal.App.2d 518, 520 [286 P.2d 568], to indicate that he is able to show estoppel to prevent the operation of the statute of limitations. However, in the claims made in *Langdon, Lagomarsino* and *Gaglione,* the court describes estoppel as consisting of acts or conduct which induces a party to believe there will be an amicable adjustment of his claim.

In the *Langdon* case, a father who was doing painting work for his son, the son was estopped to assert the statute of limitations where the son promises him he will make payment to the father. However, the father sued in that case shortly after the statute of limitations had run which is distinguishable from this case and also was for services rendered and not a gift.

If we were to believe the plaintiff, the mere fact of the promise to his mother, his grandmother and to himself would be the basis of estoppel to recover against the trust. Certainly, J. Paul had the right to change his mind or to act positively and take affirmative action to include Ronald to share in the income of the Sarah C. trust. Unfortunately for Ronald, he did not do so.

If we follow the plaintiff's theory to its ultimate conclusion, we would have to abandon the doctrine of the statute of limitations for anybody could claim that they were lulled into a false sense of security and this would be irrefutable where the purported promisor has died as in this case.

In looking at the totality of the circumstances, the purported promises of J. Paul made in 1940 were inadequate and made too late to be an estoppel to bar the application of laches and the statute of limitation.

It appears that J. Paul and plaintiff were both represented by competent legal counsel and could have instituted a number of legal remedies to equalize Ronald's position in the trust which they evidently failed to do out of either inaction or for their own personal reasons.

### Is the Reformation Action Barred by Res Judicata?

 Ronald participated, individually or through a guardian ad litem, in prior legal actions in which the trust was reformed to confirm its irrev-

ocability and the propriety of income distributions thereunder was adjudicated. Under the doctrine of res judicata, he is barred by the judgments in those actions from seeking to reform the income distribution provisions of the trust instrument.

In *Wood* v. *Herson* (1974) 39 Cal.App.3d 737, 745-746 [114 Cal.Rptr. 365], the Court of Appeal summarized the principle of res judicata as follows: "'"The doctrine of res judicata rests upon the ground that the party to be affected, or some other with whom he is in privity, has litigated, or had an opportunity to litigate the same matter in a former action in a court of competent jurisdiction, and should not be permitted to litigate it again to the harassment and vexation of his opponent. Public policy and the interest of litigants alike require that there be an end to litigation. In applying the doctrine the cases recognize a distinction between the effect of a judgment operating by way of *estoppel* in a later action upon a *different* cause of action and one operating by way of *bar* against a second action upon the *same* cause of action. [Citations.]' . . .

"'Thus the doctrine of res judicata has a double aspect. Under the doctrine considered in its secondary aspect as a collateral estoppel "[a] former judgment operates . . . in a later action upon a different claim or cause of action, . . . as an estoppel or conclusive adjudication as to such issues in the second action as were actually litigated and determined in the first action." [Citations.] It is settled that in such instances "the prior determination of an issue is conclusive in a subsequent suit between the same parties as to that issue *and every matter which might have been urged to sustain or defeat its determination.*" [Citations.]'" (Second italics added.) (See also *Pacific Mut. Life Ins. Co.* v. *McConnell* (1955) 44 Cal.2d 715 [285 P.2d 636]; *Carroll* v. *Puritan Leasing Co.* (1978) 77 Cal.App.3d 481 [143 Cal.Rptr. 772]; *Olwell* v. *Hopkins* (1946) 28 Cal.2d 147 [168 P.2d 972].)

Thus, an adjudication is binding not only as to those matters that were actually raised with respect to an issue, but also as to those matters which *could have been raised* with respect to that issue.

It was held in *Silverston* v. *Mercantile Trust Co.* (1912) 18 Cal.App. 180 [122 P. 976], that the court's approval of a trustee's accounting is a bar to a subsequent claim that the trust should be reformed to alter income distributions thereunder. The court in that case held that a plea of res judicata extends not only to the precise issue litigated, but to every matter which the parties might have raised with respect thereto.

Ronald cites *Estate of Charters* (1956) 46 Cal.2d 227 [293 P.2d 778], which holds that where the trustee is also the guardian ad litem of the

beneficiary, the trustee's accounting lacks the res judicata effect. That case can be distinguished from the case at bench, in that, the trustee was not the guardian ad litem.

In order to ascertain if the three prior actions adjudicated the validity of the trust instrument and is a bar to Ronald's claim for reformation, we must analyze each action:

(1) *Getty I.* In 1940, J. Paul brought an action to declare the trust was irrevocable and for a reformation of the trust instrument to provide specifically that it could not be revoked.

Ronald was a defendant in *Getty I,* and his guardian ad litem (his mother) filed an answer to the complaint which admitted every allegation therein and prayed that the trust be reformed to reflect the fact that it is irrevocable.

The trial court found the allegations of the complaint and Ronald's cross-complaint were true and ordered the trust instrument to be reformed to reflect the fact that it was irrevocable. It thereby adjudicated the issue of whether the trust instrument accurately reflected the understanding between J. Paul and Sarah.

(2) *Getty II.* In 1948, J. Paul commenced an action to revoke the resignation as trustee and appointment of successor trustees that he had executed in 1941. Ronald, through his guardian ad litem, filed an answer in which he opposed the requested relief. The court entered judgment for J. Paul, and settled the accounting of the interim trustees. That accounting reflected the fact that Ronald received $3,000 per year. Ronald did not object to the court's approval and settlement of the accounting.

(3) *Getty III.* In 1966, Gordon P. Getty commenced an action to declare that stock dividends received by the trust be distributed as income rather than retained as principal. Ronald joined his father in opposing this action and they prevailed at trial. As part of its findings, the trial court specifically approved J. Paul's accounting as trustee. This accounting also revealed that Ronald had received exactly $3,000 per year under the trust instrument. Ronald did not object to the accounting and, in fact, his cross-complaint prayed that it be approved.

Each of the foregoing adjudications necessarily involved the validity of the terms of the trust instrument. In *Getty I,* the issue was whether the trust instrument should be reformed to reflect the understanding reached by J. Paul and Sarah in 1934. The court adjudicated that issue. The alleged mistake concerning Dr. Helmle's wealth could have been raised at that time since

his financial condition was known by 1940. That claim was forever barred by the adjudication in *Getty I* that the trust instrument, as reformed by the court's order, was the true and irrevocable expression of the understanding of J. Paul and Sarah.

In *Getty II* and *Getty III,* the approval and settlement of the trustees' accountings constituted an adjudication of the propriety of the income distribution provisions in the trust instrument which the trustee had carried out. Hence, Ronald is barred from raising that matter.

### Was Ronald Entitled to a Jury Trial?

The test of whether a party is entitled to a jury trial was set forth by the California Supreme Court in *C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 9 [151 Cal.Rptr. 323, 587 P.2d 1136], as follows: " " "In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case— the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law." ' [Citation omitted.] On the other hand, if the action is essentially one in equity and the relief sought 'depends upon the application of equitable doctrines,' the parties are not entitled to a jury trial. [Citations omitted.] Although we have said that 'the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded' [citation omitted], the prayer for relief in a particular case is not conclusive [citations omitted]. Thus, 'The fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury. . . .' [Citation omitted.]" (Quoting *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283 [231 P.2d 832].)

Ronald's explanation of the gist of his cause of action in the second amended complaint and the remedy he seeks is contained in paragraph 38 thereof, as follows: "By reason of J. PAUL's *fraud and breach of his fiduciary and confidential relationship* with SARAH and plaintiff and his failure to carry out SARAH's intentions and purposes with respect to the oral agreement as aforesaid, Defendants named in this cause of action have since July 5, 1976 and will in the future be *unjustly enriched* by receiving pursuant to the Declaration of Trust income distributions of one-third more than they are entitled to receive. As a consequence, PLAINTIFF is entitled to one-fourth of the income from the trust property, or in the alternative to one-fourth of all sums to be received by said Defendants pursuant to the Declaration of Trust, since June 5, 1976, and said Defendants have no other or better right thereto than PLAINTIFF or his issue and said Defendants are

*constructive trustees* thereof for the benefit of PLAINTIFF and his issue."
(Italics supplied.) Ronald contends that this cause of action is for "legal
fraud with money damages." His purported cause of action is against be-
neficiaries whom he alleges are constructive trustees because they have been
unjustly enriched. Such a cause of action and the remedy he seeks are purely
equitable.

"A constructive trust is imposed upon a person in order to prevent his
unjust enrichment. To prevent such unjust enrichment an equitable duty to
convey the property to another is imposed upon him." (Rest., Restitution,
§ 160, com. c.)

The courts have held that relief of the type that Ronald has requested is
equitable in nature. In *Hartman* v. *Burford* (1966) 242 Cal.App.2d 268 [51
Cal.Rptr. 309], plaintiff alleged that her parents had entered into an oral
agreement to leave their respective estates to each other, on the understanding
that the survivor would leave his or her estate to their three children in equal
shares. The plaintiff alleged that the mother's will did not treat her equally,
and was in violation of the oral agreement and constituted fraud upon her
as one of the beneficiaries of that agreement. She requested that the executor
and legatees of her mother's will be ordered to hold an undivided one-third
interest in the estate for her benefit, and that upon distribution they be
ordered to deliver such share to her. The court held that the cause of action
was clearly equitable, and that plaintiff was not entitled to a jury trial.

"It is clear from a reading of the complaint that each of these causes of
action is equitable in nature and that the relief sought is the kind of relief
traditionally granted only in a court of equity. . . . [¶] The prayer of the
complaint is for a decree declaring that respondents hold one-third of the
estate of Katherine for the benefit and account of appellant. Thus the action
is clearly one in equity, seeking equitable relief, and jury trial is not a matter
of right." (*Id.*, at p. 270; see also *Tibbitts* v. *Fife* (1958) 162 Cal.App.2d
568 [328 P.2d 212]; *Woolsey* v. *Woolsey* (1932) 121 Cal.App. 576 [9 P.2d
605]; *Cauhape* v. *Security Savings Bank* (1899) 127 Cal. 197 [59 P. 589].)

Similarly, Ronald is not entitled to a trial by jury on the issue of equitable
estoppel to plead the affirmative defenses such as the statute of limitations,
res judicata and laches. This issue was squarely addressed in *Moss* v. *Bluemm*
(1964) 229 Cal.App.2d 70 [40 Cal.Rptr. 50], where the court held that the
plaintiff was not entitled to a jury trial as to whether or not the defendant
was estopped to assert the statute of limitations in defense of her action for
personal injuries.

It is clear from these authorities that Ronald's cause of action in the second amended action is equitable in nature and calls for equitable relief and that he is not entitled to a jury trial.

Here, J. Paul and Sarah made no contract with Ronald or anyone else to have income paid to him. Their sole contract, which was to create a trust, in the suit was to change the terms of the trust which sounds only in equity.

### Does the Statement of Decision Comply With Code of Civil Procedure Section 632?

Ronald claims the lower court's statement of decision failed to comply with Code of Civil Procedure section 632 in at least nine controverted issues, as specified by Ronald's objections.

A trial court's rendering of a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 588-599 [207 Cal.Rptr. 728].)

As the court further said in *Cheryl E.*, page 598: "We recite our oft-repeated refrain: When a finding of fact is attacked on grounds that it is not supported by substantial evidence, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings. (*Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407, 413 [188 Cal.Rptr. 781].)

"The reviewing court looks to the evidence supporting the successful party and must disregard any contrary showing. (*Id.*, at p. 414.) When two or more inferences can reasonably be deduced from the facts, we are without power to substitute our deductions for those of the trial court. The testimony of a single witness, even a party, is adequate to support the trial court's findings. (*Coldwell Banker & Co.* v. *Pepper Tree Office Center Associates* (1980) 106 Cal.App.3d 272, 277 [165 Cal.Rptr. 51].) All the evidence most favorable to respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, we must affirm the judgment. [Citation omitted.]

"PSSA, in its attacks on the trial court's findings, asks us to reweigh the evidence on appeal and draw inferences contrary to those of the trial court. This we can not do. The interpretation of testimony is the exclusive province

of the trial judge. (*Rees* v. *Department of Motor Vehicles* (1970) 8 Cal.App.3d 746, 751 [87 Cal.Rptr. 456].) It is the function of the trial court to weigh all the evidence and to draw any reasonable inferences it finds warranted. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 545 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].) . . ."

 Thus, all the nine issues that Ronald alleged were omitted in plaintiffs' comments in regard to proposed statement of decision were addressed by the trial court, either directly or by a finding from an ultimate fact.

A comparison of Ronald's request for statement of decision and the trial court's findings reveals, as indicated below, all necessary findings were made.

### Should the Trust Be Reformed?

 A reformation action lies when a written instrument does not accurately reflect the oral understanding which gave rise to it. (Civ. Code, § 3399.) Civil Code section 3399 provides: "*When contract may be revised.* When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

 The sole purpose of the reformation doctrine is to correct a written instrument in order to effectuate a common intention of the parties which was incorrectly reduced to writing. (See *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 663-664 [297 P.2d 638].)

A court cannot, under a theory of reformation, create a new agreement for the parties which conforms to circumstances other than those that they had mistakenly assumed were true. If the written instrument accurately reflects the agreement of the parties, albeit an agreement based upon a mistaken assumption of fact, an action for reformation does not lie. (*Bailard* v. *Marden* (1951) 36 Cal.2d 703 [227 P.2d 10]; *Lemoge Electric* v. *County of San Mateo, supra,* 46 Cal.2d 659; 1 Witkin, Summary of Cal. Law (8th ed. 1974) Contracts, § 306, pp. 257-258.)

 In *Bailard,* the plaintiffs brought suit to reform a sale contract and grant deed, alleging that the parties mistakenly believed that the property was in an area restricted to residential uses. The trial court so found, and ordered the deed reformed to restrict the property to such uses. The Court

of Appeal reversed stating that, "The purpose of reformation is to effectuate the common intention of both parties which was incorrectly reduced to writing." (*Bailard* v. *Marden, supra,* 36 Cal.2d 703, 708.) Although the evidence suggested that the defendants had intended to purchase the property for residential purposes, ". . . it does not establish that they ever intended to buy the property under a contract prohibiting any other use or to accept a deed including such a restriction. Under these circumstances, reformation of the contract and the deed to prohibit the erection of any building other than a single-family residence does not express 'the intention of the parties.' Rather, it is the creation of a contract which the evidence does not show was ever agreed to by [the defendants]." (*Id.,* at pp. 709-710; see also *McConnell* v. *Pickering Lumber Corporation* (9th Cir. 1954) 217 F.2d 44, 48.)

In the case at bench Ronald claims that J. Paul and Sarah were operating under a mistaken assumption (i.e., that Ronald would receive a substantial inheritance from Dr. Helmle) when they agreed to the terms of the trust. However, he does not contend that the language of the trust instrument fails accurately to reflect the oral understanding reached by J. Paul and Sarah in 1934.

In the case of *F. P. Cutting Co.* v. *Peterson* (1912) 164 Cal. 44 [127 P. 163], reformation was permitted because the understanding reached by a tomato grower and a wholesaler (i.e., that the purchase price of the tomatoes would be the Canners' Association opening price, or the price set forth in the contract, whichever was lower) was not accurately set forth in the written contract (i.e., it referred only to the Canners' Association opening *printed* prices, which, as it happened, were not put into print that year). Thus, the oral agreement in *F. P. Cutting* was clearly established, but inaccurately reduced to writing, and could be saved through reformation.

The alleged "mistake" that Ronald relies upon in his brief (i.e., the mistaken assumption that Ronald would receive a substantial inheritance from Dr. Helmle) is not a failure accurately to reduce a specific understanding of the parties to writing, but rather, a failure of the parties to know the true state of the facts. As indicated by the foregoing authorities, such a "mistake" is not one which the court can correct by reformation.

What the appellant asked the court to do is to create a new agreement as such that it speculates what the donor might have done if they had not prophesied the future incorrectly.

The courts have said that the cases of reformation "involved factual situations whereby the contract as reformed corresponded with a prior

agreement between the parties" (*McConnell* v. *Pickering Lumber Corporation, supra,* 217 F.2d 44, 48) applying California law, that is, there must be a specific agreement to which the writing can be reformed; it must be shown that the parties have agreed to the terms of the contract as sought to be established. Therefore, if no agreement was reached, there would be no standard to which the writing could be reformed. (*Id.,* at p. 44.) That is the case here; there is no standard.

## DOES RONALD HAVE STANDING TO SEEK REFORMATION?

 California Civil Code section 3399 codifies the equitable action for reformation.[1]

 The purpose of Civil Code section 3399 is to permit a court in equity to do equity.

 Although the earlier cases such as the *Estate of Tompkins* (1901) 132 Cal. 173 [64 P. 268] and *Enos* v. *Stewart* (1902) 138 Cal. 112 [70 P. 1005], seem to state that a donee has no standing to enlarge a gift through reformation, it would appear that the more recent cases now allow standing.

In the case of *Orcutt* v. *Ferranini* (1965) 237 Cal.App.2d 216 [46 Cal.Rptr. 715], the court held that the beneficiaries were aggrieved parties under section 3399, stating that an "aggrieved party need not be an original party to the transaction; it clearly includes one who has suffered prejudice or pecuniary loss." (*Id.,* at p. 224; see also *Jackson* v. *Aetna Life & Casualty Co.* (1979) 93 Cal.App.3d 838, 847-848 [155 Cal.Rptr. 905]; *Cantlay* v. *Olds & Stoller Inter-Exch.* (1932) 119 Cal.App. 605 [7 P.2d 395].)

Ronald was an intended beneficiary of the agreement between Sarah and J. Paul establishing the Sarah C. Getty Trust of 1934. He has suffered prejudice and pecuniary loss. He is an aggrieved party and has standing under section 3399.

Further, there is no requirement for the party seeking reformation to have paid some consideration. (*Parker* v. *Hardisty* (1921) 54 Cal.App. 628, 633 [202 P. 479].)

---

[1]Civil Code section 3399 reads as follows: "*When contract may be revised.* When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value."

The "governing principle is not the presence or absence of a money consideration but is whether or not one of the parties has equities which are superior to those of the other." (*Reina* v. *Erassarret* (1951) 103 Cal.App.2d 258, 265 [229 P.2d 92].)

Where there is a mistake of fact, a person who paid no consideration but has the equities in his favor, may seek and obtain reformation. (*Ferguson* v. *Ash* (1915) 27 Cal.App. 375, 379-380 [150 P. 657].)

Although the appellant has the standing to sue for reformation, he still has many other hurdles to gain access to the trust.

### DO THE FINDINGS OF THE TRIAL COURT ESTABLISH THE TERMS OF THE TRUST?

Ronald poses two "issues" at the outset of his brief for this court to decide.

The first issue presented by Ronald in his brief is as follows: "When a grandmother [Sarah] creates a trust with her son [J. Paul] based on a mutual mistake of material fact, may a court in equity reform the trust to permit its true intents and purposes to be accomplished by providing equally for her grandchildren [Ronald and his brothers] and great-grandchildren?" However, the trial court found that the trust instrument accurately reflected the true intents and purposes of Sarah and J. Paul.[2]

The trial court found in the statement of decision that J. Paul and Sarah were not operating under any mistake in arriving at those provisions and also found in the statement of decision, paragraph 3, that the assumption as to which Ronald contends the trustors were mistaken (that Dr. Helmle was wealthy) was actually correct.[3]

---

[2] "When she executed the Declaration of Trust, Sarah knew what it provided, including the fact that it made different provision for her grandson Ronald than for any of his brothers and that it provided unequally for Ronald, and Sarah executed the Declaration of Trust with the intention that it provide for Ronald and J. Paul's other children in precisely the way in which it did so provide. She did so with the complete understanding as to what the Declaration of Trust provided taking into account all of the possible means by which any of her grandchildren could be provided for. At the time of the execution of the Declaration of Trust in 1934, J. Paul, taking into account all of the possible means by which any of his children could be provided for, also intended that all of his children, including Ronald, be provided for in precisely the way in which the Declaration of Trust does provide for them."

[3] "Before and at the time of the execution of the Declaration of Trust in 1934, Ronald's maternal grandfather Dr. Otto Helmle [Dr. Helmle] was a wealthy man. By the standards of the time, being the years of the Great Depression, Dr. Helmle was a very wealthy man. He was reputed to be wealthy, and both J. Paul and Sarah believed he was wealthy."

Further, the trial court found (italics added): "*Inasmuch as neither fraud, mistake, undue influence, overreaching or pressure entered into the making or execution of the Declaration of Trust of 1934, the motives of J. Paul and Sarah in providing differently for Ronald than for his brothers are immaterial and irrelevant.*" "Nevertheless the court finds that the principal motive is that stated in a supplement to the declaration of trust dated April 2, 1941, viz., that at the time of the execution of the declaration of trust in 1934, Ronald's grandfather, Helmle, was reputed to be very wealthy and Ronald had expectations of inheritance directly or indirectly from said maternal grandfather. A contributing motive was that J. Paul and Sarah did not wish any income of the trust to go to Germany. Fini Helmle Getty left the United States and returned to her homeland, Germany, in July, 1929, six months after her marriage, bore Ronald in Germany in December 1929, and thereafter refused to return to the United States, resulting in a divorce in 1932, and J. Paul and Sarah apprehended that Ronald would be raised in Germany was a German boy and would live in Germany."

Thus, the court's findings dispose of Ronald's claim, regardless of whether the alleged "mistake" is that the trust instrument does not reflect the agreement of the trustors or that their agreement was premised upon an erroneous assumption about Dr. Helmle's wealth.

 Ronald's second "issue" is whether he should be barred from prosecuting his cause of action in light of J. Paul's promises to provide for him, made to Sarah, Fini and himself.

A. *Alleged Promise to Sarah*

It is plaintiff's contention that as a result of Helmle's property being confiscated by Hitler that J. Paul and Sarah were mistaken as to the inheritance of Ronald and the inference is that if they had known the true facts, the trust would have been equalized on behalf of Ronald. The only testimony Ronald offers in that regard is that the essence of Norris Bramlett's testimony[4] is that in order to keep Sarah from revoking the trust, J. Paul promised her in 1940, that he, J. Paul, would equalize Ronald's income with his brothers'.

There is no basis in evidence to change the trial court's finding as to the alleged promises to Sarah. The trial court found in the statement of decision,

---

[4]Norris Bramlett testified about a dinner conversation at Mike Lyman's in Los Angeles on Sixth Street between Hill and Olive he had in 1952 or 1953 with David Hecht, J. Paul's attorney, and Fero Williams, a close confidante to J. Paul. Mr. Bramlett worked for J. Paul from 1937 until Getty's death in 1976, during which period Mr. Bramlett had responsibilities relating to the trust.

paragraph 8[5] that J. Paul made no such promise or representation to Sarah at any time or in any connection and that nothing Sarah did or refrained from doing in 1940 or after 1934, did she rely on any such promise by J. Paul.

### B. *Alleged Promise to Fini*

Regarding Fini Getty's conversation with J. Paul: "MRS. GETTY: *I called him up the other day and I told him the thing was unfair that that boy should be left out.* . . . The whole thing is in the papers this morning and everybody knows about it.

"MR. NIVEN: Well now, what is going to be done. How did you and Mr. Getty leave the matter?

"MRS. GETTY: He said that he would talk with his lawyer and then he said he would call me some time today. I said he could call me any time because I was going to be at home. Do not file the papers until you have my word.

"Exhibit 207 (emphasis added). The following day, apparently after speaking with J. Paul, Fini authorizes Mr. Niven to serve and file her answer. Exhibit 208. She does not seek reformation of the trust for Ronald based on J. Paul's representations he would equalize Ronald."

In that regard the trial court in its statement of decision found in paragraph 9 that: "9. Neither in 1940 nor at any other time, either in connection with *Thomas A. J. Dockweiler and George Franklin Getty II, as Trustee v. J. Paul Getty, et al.,* Case No. 542151, Los Angeles Superior Court (hereafter referred to as 'Getty II') did J. Paul promise or represent to his former wife Fini, mother of Ronald, that he would provide for Ronald in such a way as to equalize Ronald's treatment under the terms of the Declaration of Trust of 1934. Fini at no time refrained from taking any action or instituting any legal procedure that she otherwise would have taken or instituted in reliance upon any such promise or representation by J. Paul."

---

[5]"8. There is no evidence that, either in 1940 or 1941 or at any other time, either in connection with that certain lawsuit entitled *J. Paul Getty v. Sarah C. Getty, etc., et al.,* No. 452368, Los Angeles Superior Court (hereafter referred to as 'Getty I'), or in any other connection or at all, J. Paul promised or represented to Sarah that he would provide for Ronald in such a way as to equalize Ronald's treatment under the terms of the Declaration of Trust of 1934. The Court finds that J. Paul made no such promise or representation to Sarah at any time or in any connection and that in nothing Sarah did or refrained from doing in 1940 or after 1934 did she rely on any such promise by J. Paul."

## C. *Promise to Ronald*

Ronald claimed that his father promised him that he would equalize the trust in his behalf. Ronald received $200,000 in trust which later became approximately 79,000 shares of Getty Oil Stock from the 1941 will of Sarah, four times the sum received by his brothers thereunder. Also in 1976, he received a home the value of which was $1 million and $7 million in executor fees under the will of J. Paul.

Ronald's first conversation with his father was in 1948 and at that time J. Paul was *not* the trustee. Only Ronald was present at any of these conversations with his father, and Ronald admitted that his father never *told him how he would take care of any disparity between Ronald and his brothers* or what specific action he would take.

However, the trial court specifically found that J. Paul never promised to correct any inequality. Findings Nos. 8, 9 (see *ante,* p. 1183) and 10[6] establish that neither Sarah, nor Fini, nor Ronald relied upon any such promises in refraining from seeking reformation of the trust instrument, because no such promises were ever made.

Moreover, to the extent that the trial court heard evidence which conflicts with these two findings, he obviously chose not to believe it. Under the law, he is entitled to do so. A trial court's finding will not be disturbed on the ground that it is contrary to unrebutted evidence unless there are no circumstances from which it can be inferred that the evidence was not credible. (*La Jolla Casa deManana* v. *Hopkins* (1950) 98 Cal.App.2d 339 [219 P.2d 871].)

 These findings are dispositive. Because there were no promises to equalize Ronald, there can be no estoppel to assert res judicata or the statute of limitations. The reformation cause of action that Ronald seeks to resurrect is barred by those affirmative defenses.

While it is true this court can reverse the findings of the trial court, it would be only in the proper case, if there is not substantial evidence to support the verdict.

---

[6]"10. Neither in 1948, nor in 1966 in connection with the lawsuit entitled *Gordon Peter Getty et al.* v. *J. Paul Getty, etc.,* Case No. 570527, San Francisco Superior Court [hereafter 'Getty III'], nor at any other time did J. Paul promise or represent to Ronald that J. Paul would provide for Ronald in such a way as to equalize Ronald's treatment under the Terms of the Declaration of Trust of 1934. At no time did Ronald inform J. Paul that unless J. Paul made some such promise Ronald would institute legal proceedings against his father. At no time did Ronald refrain from instituting legal proceedings of any kind whatsoever against J. Paul or taking any action in reliance on any promise or representation of J. Paul."

In this case after reviewing all the evidence, the reporter's and clerk's transcripts and the reasonable inferences that could be drawn therefrom, this court finds there is substantial evidence in the record to support the verdict.

Even giving Ronald the benefit of the doubt, all we have is a promise or promises to equalize him with his brothers by J. Paul that were ambulatory. Although J. Paul's intentions appeared sincere, his inaction, for whatever reason, worked to the detriment of Ronald. It's an old adage, but a true one, "The saddest words ever penned are those, *it might have been.*"

## BENEFICIARIES CANNOT BE ESTOPPED

Ronald argues that the trust beneficiaries are estopped to assert res judicata, the statute of limitations and laches because J. Paul allegedly promised Ronald that he would be equalized with his brothers. Even if such promises had been made they would not prevent the trust beneficiaries from asserting res judicata, the statute of limitations or laches to defeat Ronald's reformation claim.

The trial court found no such promises were ever made.

Estoppel is an equitable doctrine which will not be applied against one who is blameless. (*Ricciardi* v. *County of Los Angeles* (1953) 115 Cal.App.2d 569, 578 [252 P.2d 773].) Estoppel applies only if there is "some element of fraud or blame on the party against whom the estoppel is asserted." (*Gamboa* v. *Atchison, Topeka & Santa Fe Ry. Co., supra,* 20 Cal.App.3d 61, 65.) Ronald has never alleged any conduct on the part of the trust beneficiaries which induced anyone to refrain from taking action to reform the trust instrument.

Ronald has cited three cases for the proposition that an estoppel is binding on those "in privity" with the party whose acts induced reliance. (*Hartway* v. *State Board of Control* (1976) 69 Cal.App.3d 502 [137 Cal.Rptr. 199] [California governmental agencies are in privity with each other under certain circumstances]; *Estate of Coleman* (1955) 132 Cal.App.2d 137 [281 P.2d 567] [minor heirs are in privity with their deceased father with respect his right to challenge a divorce decree affecting their rights to his estate]; and *Cramer* v. *Biddison* (1968) 257 Cal.App.2d 720 [65 Cal.Rptr. 624] [executors of an estate are in privity with the deceased with respect to his right to challenge a divorce decree].)

Those cases are distinguishable. In each of them, there was a mutual or successive relationship to the same rights or property. This is required

in order for one party to be in privity with another for estoppel purposes. (*Zaragosa* v. *Craven* (1949) 33 Cal.2d 315, 318 [202 P.2d 73, 6 A.L.R.2d 461].)

 In the instant case, the trust beneficiaries are not in privity with J. Paul, because his alleged promises related to his personal assets, and not to the trust, the trust assets or the trust income. Ronald admits this: "The equalization after J. Paul's death would be done *by J. Paul* who could 'provide for such equalization *in his own will*' or otherwise."

Ronald brought such a cause of action against the principal beneficiary in count III of this case of J. Paul's estate and had already settled it for $10 million. The daughters of George F. Getty II were not legatees under J. Paul's will and thus were not appropriate defendants to such a claim.

The promises that Ronald alleges J. Paul made to Sarah, Fini or Ronald could only have been made in his individual capacity and therefore could not bind the trust, its assets or its income. As trustee, J. Paul was powerless to do anything with the principal or income of the trust other than what the trust instrument required, namely, to pay Ronald $3,000 per year. By virtue of the decision in *Getty I,* J. Paul, as trustor, could not reform the trust to provide more income for Ronald.

The beneficiaries of the trust cannot be estopped from asserting legitimate defenses to Ronald's attack upon the terms of the trust because they are not in privity with J. Paul with regard to his alleged promises to provide for Ronald with his own assets. Therefore, they were properly dismissed from the second amended complaint.

Judgment and order affirmed.

Lillie, P. J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 25, 1987.